## C. E. YOUNG v. STATE.

No. A-6245.   Opinion Filed Nov. 9, 1928.
(271 Pac. 426.)

Jno. L. Ward, L. O. Todd, and A. W. Kelley, for plaintiff in error.

Edwin Dabney, Atty. Gen., Smith C. Matson, Asst. Atty. Gen., N. B. Johnson, Co. Atty., and H. Tom Kight, for the State.

EDWARDS, J. The plaintiff in error, hereinafter called defendant, was convicted in the district court of Rogers county on a charge of manslaughter in the first degree and was sentenced to serve a term of four years in the state penitentiary.

The evidence is conflicting in many particulars; that for the state discloses a state of facts about as follows: On the date charged, defendant with his wife and some children and A. P. Davis, a codefendant, drove from Tulsa in an automobile about 21 miles to a neighborhood in Rogers county known as "Timber Ridge" for the purpose of visiting one Lige Teague. W. E. McMillan, with his family of several children, the oldest being Homer McMillan, a boy of 18 years, lived on a farm about a quarter of a mile from Teague's place. A small church building was just across the section line from the Mc-Millan home. The week before, a daughter of defendant, about 13 or 14 years old, had visited the Teague home. There had been some difficulty among the youngsters of that age, and a boy named Jack Piquet was re-

ported to have struck the girl or to have called her a liar. On the morning of the homicide, when defendant and his party arrived opposite McMillan's home, they encountered Lige Teague, and also some young people who had been to Sunday school. Teague signaled Young, who stopped his car, and Teague then pointed to Piquet and informed defendant he was the boy that had called his daughter a damn liar. Defendant got out of his car, started toward Piquet but was stopped by some one and a quarrel ensued. McMillan at the time was on a pallet on his porch. Homer McMillan told the persons there they did not want any fussing in front of the home, whereupon Davis, of defendant's party, attempted to assault him. The elder McMillan then got up from the pallet and told the party either to go up the road or down the road, but not to start any fight there. Davis in substance informed McMillan they would not move in either direction. Whereupon McMillan went in the house, got his gun, came out and sat down with it across his lap, and told the Young party to move on. Defendant said, "Let's go, let the folks out at Teague's, and we will go get our guns and get the son-of-a-bitch. He and Davis then got in the car and left Teague in front of McMillan's house and drove to Teague's, let out the other members of the party, then drove back by McMillan's house, and Teague asked them how long before they would return. Defendant replied as soon as they could go to Tulsa and get their guns. Defendant and Davis then drove to Tulsa, procured guns, and were joined by two of defendant's sons and the wife of one of them, and two other men who worked with him in an iron foundry at Tulsa. They returned to the McMillan place. In the meantime McMillan, becoming apprehensive, sent to one of his neighbors, Bates Weaver, and asked him to come over, as he anticipated trouble, and asked him to send to Catoose for a deputy sheriff so that trouble might be averted. Weaver came to Mc-

Millan's place, and soon the car with defendant and Davis and his party arrived. Defendant alighted from the car and directed his party to alight and walked over to Weaver, who was near his car in McMillan's yard, and demanded what he was doing there. Weaver informed him that he was there to prevent him murdering McMillan. Defendant put his gun into the stomach of 'Weaver and informed him he would kill him. Weaver caught the gun by the barrel and a scuffle ensued, in which the gun was discharged, but no one was hit. McMillan got up from his bed, took his Colt's pistol and went to the door. Homer McMillan took a shotgun and went to the southwest corner of the house. The two sons of Young were in the road directly in front of the McMillan house, and as McMillan appeared in his door they fired into the door casing with Luger pistols. McMillan thereupon killed both of them, and defendant, by this time having wrested the gun from Weaver, turned and killed Homer McMillan, who was standing at the corner of the house with a gun in his hand, and who had just fired but had missed his mark. During this time Davis was shooting at Weaver. The elder McMillan then shot at defendant and hit the barrel of the gun, knocking it from defendant's hand, fired again, and broke the leg of defendant, who fell. The firing then ceased. When the smoke had cleared away the two sons of defendant were dead, and the son of McMillan died the same day in a hospital at Tulsa. The evidence of the state is contradicted and explained by the evidence of defendant and his witnesses and by the cross-examination of the state witnesses. The testimony of W. E. McMillan in particular was much shaken on the cross-examination. Defendant's evidence supports his theory that one of the Young boys was killed by Homer McMillan and that the killing of Homer McMillan by defendant was in his necessary self-defense and in the defense of relatives. Many details are omitted, but the respective theories and the

evidence in support present a question of fact for the jury. They must have believed in large part the evidence of the state.

It is apparent from this recital of facts that this tragedy which resulted in the death of three young men arose without any substantial cause for conflict and was entirely unnecessary, even among persons ready and willing to enter into a combat. It must have appeared to the jury that defendant was willing to enter into a combat with a deadly weapon, and under such view, which is sustained by ample evidence, they were exceedingly lenient in fixing the punishment. The punishment fixed would indicate further that they also considered the elder McMillan at fault in too readily entering into this shooting affray.

The first assignment of error argued is that the trial jury was not drawn and impaneled as provided by law. It appears that the names of the entire panel of the petit jurors were each written on a separate piece of cardboard paper of a uniform size, and these cards, without being folded, were put in a wooden box about four inches wide, eight inches long, and six inches deep, and the box shaken before any names were drawn out. The names were drawn by the court clerk. The statutes applicable to the formation of a trial jury are sections 2643 and 2649, inclusive, Comp. St. 1921. In substance, they provide that the names of the jurors shall be written upon uniform slips of paper, folded, placed in a box, and the box shaken to intermingle the ballots before any names are drawn, and that the clerk shall not look at the slips before drawing them from the box. These provisions of the law were not literally complied with. Upon motion being made, however, testimony was taken and the clerk in part testified:

Direct examination: "* * * Q. I will ask you, Mr. Robinson, if during the impaneling of this jury or during

the formation of this jury in this case, if you took this box and closed it up and shook it immediately before withdrawing each name? A. No, sir. I took it and closed it up and shook it before I started to draw them, and then I put it so I could not see in it and drew the names out. * * *"

On cross-examination: "Q. Before you started to draw this jury, you took these names that had been written on these pieces of cardboard, and placed them in that box, did you? A. Yes, sir. Q. Then you took that box and shook it? A. Yes, sir, I did. Q. So as to mix and mingle these various pieces of cardboard together? A. Yes, sir. Q. And then when you were required to draw another name to fill a vacancy on the jury, you put the box where you could not see in it, and reached in and drew a name? A. Yes, sir. Q. And whether the writing on the board was turned up or down, the box was in a position where you could not see in there? A. I couldn't see in there. Q. Or tell anything about who you were getting? A. No, sir. * * * Q. But you did shake it a number of times during the time? A. I never could see in it. I always put it where I can't see in it, so I will have to reach in. I haven't any idea as to who is coming out of the box. * * *"

The objection to the manner in which the jury was impaneled was not made until the second day of the trial, after the original panel had been exhausted, the second panel drawn and exhausted except for one name in the box and after eight challenges on each side had been used. The court then offered to discharge the single juror whose name remained in the box, and in substance ruled that there was a substantial compliance with the law, and defendant could have sustained no prejudice by the failure to conform strictly to the requirements of the statutes. This court in the case of Grant v. State, 11 Okla. Cr. 396, 146 P. 919, held that where these statutes are not complied with the court should sustain a challenge to the panel. In that case the names were written on slips which were not folded; but no showing was made that the clerk did not see the names before the

slips were drawn, nor that the entire panel was exhausted in selecting a jury for the trial of that case. Where the entire panel is exhausted before the jury is secured it can make no difference which name is first taken from the box. As the purpose of this statute is to prevent the jury from being hand-picked and to provide that a trial jury shall be selected from the panel by lot, if any prejudice were made to appear we would promptly reverse this case. A substantial compliance with the statute will be sufficient when the deviation is not prejudicial. Section 3526, Comp. Stat. 1921. See, further, Wadsworth v. State, 9 Okla. Cr. 84, 130 P. 808; Littrell v. State, 21 Okla. Cr. 466, 208 P. 1048.

It is next argued that the court erred in admitting incompetent evidence offered by the state. This assignment is directed to several items of testimony. The state was permitted to show that on Sunday preceding the homicide some of the young people of the neighborhood had a quarrel and fight at and near the church across the road from the McMillan home, and to show that a few nights before the tragedy there was some difficulty between a number of men in the highway in front of the McMillan house. The defendant was not present at either of these occasions. Presumably the first of these matters was offered to explain the statement of Teague to defendant at the time they met on the day of the tragedy near the McMillan house. We do not perceive just why the difficulty that occurred a few nights before the homicide was relevant or competent. There are other items also erroneously admitted. We have examined each of them carefully. In several instances the witnesses made some hearsay statement or testified to some statement by some third person not binding on defendant and which should have been excluded. Upon the whole record, however, we are of the opinion that these errors are inconsequential when considered

with the main facts of the homicide and that they did not affect the verdict. They fall within the provisions of section 2822, Comp. Stat. 1921, defining harmless error, and do not require a reversal.

Complaint is made that the court refused to permit defendant to show that a list of the witnesses to be used by the state was not served two days before the case was called for trial, as required by article 2, § 20, Bill of Rights. This was the second trial of this case. The record discloses that prior to the first trial a list of names of the witnesses with their addresses was properly served. It is the contention of the defendant, in substance, that the list should again be served before entering upon this trial. The object of the constitutional provision is to inform defendant of the names and addresses of the witnesses the state intends to use against him so that he may investigate the character of the witnesses and be prepared to meet their testimony. When a defendant has once been served with this list and receives the information contemplated, the constitutional requirement is satisfied; and it is not necessary to again serve the list in case of a mistrial unless the state intends to use additional witnesses not contained in the list served, in which case the names and addresses of such additional witnesses must be served to comply with the constitutional requirement. In the case before us no additional witnesses were called, and hence it was not necessary to again serve the list.

Some argument is advanced that the court made prejudicial remarks in the presence of the jury panel at the time of the general examination at the beginning of the term. It appears that when the jury panel was examined generally as to their qualifications for service at the term, the court in stating generally the duties of jurors said:

"Gentlemen, we are now entering upon a criminal

term, where we have several cases in which there are several defendants, some of whom are no doubt very anxious to convince you of their innocence. Their friends may make improper approaches to you, gentlemen, and I want to insist, if you are approached improperly by any person as to how your ballot should be, that you report that to the court. It is not proper that jurors should be approached, either by way of whisky, if any of you should happen to drink, or in any other way, and it is just as necessary that you keep your reputation uninsulted as any other part of the court machinery, and I want to insist, gentlemen, that if any improper approach is made to you by anyone to try to influence your actions on the jury, that you report that matter to the court. I believe we have one or two other jurors who have just gotten in; stand up, gentlemen, the ones who have not been qualified."

This, defendant contends, is prejudicial as suggesting that the friends in this case might attempt to improperly influence them. It is not shown that the remarks of the court influenced any juror in this case, or that the court had in mind or referred to the defendants in this case. While the language used is not approved, yet it is proper for the trial judge to instruct the jurors at the time the panel is examined on voir dire as to their duty generally. It should be in terms applicable alike to the state and the defendant. See Pate v. State, 15 Okla. Cr. 90, 175 P. 122.

Objection is also made that the court permitted counsel for the state in examining the jury to inquire if they were members of any church or if they had been members of any church. It is true that church membership does not determine the qualifications of a juror, but a prospective juror, within reasonable bounds and limited by a fair discretion of the court, may be examined as to his membership in any organization which might give counsel information and enable him to properly exercise his peremptory challenges. Menefee v. State, 30 Okla. Cr. 400, 236 P. 439; Cummings v. State, 32 Okla.

Cr. 274, 240 P. 1078; Raymer v. State, 32 Okla. Cr. 385, 241 P. 499; Buchanan v. State, 33 Okla. Cr. 312, 243 P. 992; Roof v. State, 34 Okla. Cr. 145, 245 P. 666; Cooley v. State, 34 Okla. Cr. 281, 246 P. 650.

It is argued at some length that the court erred in refusing to give certain requested instructions and in the giving of several of the instructions of the court's charge. To discuss each of the requested instructions refused by the court and the instructions given by the court and complained of is not necessary. We have examined the charge of the court and the requested instructions and are of the opinion that the requested instructions, so far as applicable, are sufficiently covered by the charge of the court, and that the charge considered and construed as a whole sufficiently covers the issues in the case, and is without any material error and is as favorable to defendant as the law warrants. Ussaery v. State, 22 Okla. Cr. 397, 212 P. 137; Lacy v. State, 30 Okla. Cr. 273, 236 P. 53; Collins v. State, 32 Okla. Cr. 136, 240 P. 135; Brown v. State, 24 Okla. Cr. 161, 216 P. 944; Wilkie v. State, 33 Okla. Cr. 225, 242 P. 1057; Tritthart v. State, 35 Okla. Cr. 41, 247 P. 1111.

Some other matters are suggested in the briefs, but, upon a consideration of the entire case, we are convinced the errors are not materially prejudicial; that defendant had a fair trial and there has been no miscarriage of justice.

The case is affirmed.

DOYLE, P. J., and DAVENPORT, J., concur.