Master BENNETT, Plaintiff-in-Error,

v.

The STATE of Oklahoma, Defend-
ant-in-Error.

No. A–14385.

Court of Criminal Appeals of Oklahoma.

Dec. 4, 1968.

Archibald B. Hill, Jr., Oklahoma City, Attorney for plaintiff in error.

G. T. Blankenship, Atty. Gen., Charles L. Owens, Asst. Atty. Gen., for defendant in error.

BUSSEY, Judge.

Master Bennett, hereinafter referred to as Defendant, was charged by preliminary information in the Court of Special Sessions for Oklahoma County, with the crime of Murder. The more specific allegation of the information was that the defendant, on June 14, 1965, discharged a .38 calibre revolver into the body of one Ted L. Oulds, and as a result of the wounds inflicted by this assault, the victim died instantly. After preliminary hearing was had in said court, the defendant was bound over for trial in District Court on July 28, 1965.

Subsequently, upon the application of his attorney, a judge of the District Court on October 6, 1965, ordered that the defendant be committed to Central State Hospital at Norman, Oklahoma, for observation and examination for a period not to exceed ninety days. By its order of December 15, 1965, the District Court, upon advice of the attending physician at the hospital, found that the defendant was able to distinguish right from wrong and could advise his attorney in his own defense. The court therefore ordered that he be returned from the hospital. The defendant was so returned, but on December 20, 1965, the District Court issued an order in which it was determined that the defendant was presently insane and should be committed to Central State Hospital for treatment until such time as the doctors at said hospital should declare him to be presently sane. He was so committed to said hospital until the District Court, by its order of December 6, 1966, found, upon advice from the hospital, that the defendant was presently sane and ordered that he be returned for further criminal proceedings.

The trial of this defendant, by a jury, commenced on January 17, 1967, and was concluded on January 19, 1967, on which date the jury returned a verdict finding the defendant guilty of the crime of Murder and assessing his punishment at death. Thereafter, counsel for the defendant filed a Motion in Arrest of Judgment and a Motion for New Trial. A hearing on said motions was held on February 2, 1967, and at the conclusion of same, both motions were denied. On that same date judgment and sentence was entered in accordance with the jury's verdict. It is from such judgment and sentence that this appeal is brought to this Court.

Briefly stated, the facts adduced on the trial reveal that the defendant and Patricia Oulds were divorced on April 28, 1965, and in the divorce proceedings the defendant was given visitation rights to his three children, whose custody had been awarded to the wife. On June 14, 1965, at about 8:00 a. m., the defendant picked up the children at the home of Patricia's parents where she was living after the divorce. Shortly thereafter, the defendant returned the children to their mother. He pushed his way into the house through the front door and Patricia could see that he had a gun behind his back. She ran to a bedroom where her father, Ted L. Oulds, was sleeping. Before proceeding into the bedroom behind Patricia, the defendant was confronted by Veldas Oulds, Patricia's mother, who had come into the living room of the house. The defendant fired one shot at Mrs. Oulds, hitting her in the arm. He then proceeded into the bedroom where Ted Oulds sat up in bed and inquired what was going on. The defendant fired a shot into the head of this victim and another shot into some part of the bed, missing Mr. Oulds this time. He fired a shot at Patricia, who had crawled under a bed, hitting her in the arm. The defendant then fired two more shots into the body of Ted Oulds, who was pleading with the defendant not to shoot him again. The defendant then left the house and drove away. Shortly thereafter, after a description of his car had been given to policemen on duty at the time, he was arrested by Officer Hubert Box, after he was observed sitting in his car across the street from the police station.

Through the testimony of Betty Williams, sister of Patricia Oulds, and daughter of Veldas Oulds and the deceased Ted Oulds, the State presented evidence that

on June 13, 1965, the witness had a conversation with the defendant, in which the defendant said that he would kill Patricia and the whole family if Patricia did not come back to him. This witness further testified that the defendant had made the same threat previously when he was separated from his wife.

The defendant did not testify in his own behalf. His principal evidence was the testimony of Dr. Huber, a psychiatrist at Central State Hospital, who testified that he was not in charge of the treatment of the defendant, but that he saw him every other week during the year that he was treated at the hospital. He further testified that it was "probable" that the defendant was insane on June 14, 1965. The only other evidence of any possible significance presented by the defendant was the testimony of Roy McMillin, the defendant's immediate supervisor at his place of employment at Tinker Field, and Billy Lair, a jailer at the Oklahoma County jail. The former testified as to the defendant's reputation as he knew it and to the fact that a few days before the homicide in question, he had a conversation with the defendant and at that time the defendant was quite disturbed about some financial problems and about his broken marriage. The jailer merely testified that the defendant was quite nervous when he was in jail following the homicide, and that he was taking medicine prescribed by the jail doctor.

On appeal the defendant argues several assignments of error which we will treat in the order in which they arose in the trial, and during the preliminary proceeding, and not necessarily in the order in which they were presented in the defendant's argument and brief.

From the record it appears that a preliminary hearing was conducted in the Court of Special Sessions before the Honorable John H. Porter, on the 28th day of July, 1965, at the conclusion of which the defendant was bound over to the District Court of Oklahoma County. Neither at the preliminary hearing, nor prior to his trial in District Court, nor in his Motion for New Trial, did the defendant question the jurisdiction and authority of Judge Porter to conduct the preliminary hearing, but instead, for the first time on appeal, he raises the issue of the judge's authority to act in conducting the preliminary hearing and in finding probable cause to bind the defendant over to the District Court. As authority, the defendant cites 22 O.S. § 451, which provides:

> "When the indictment or information is filed, the defendant must be arraigned thereon before the court in which it is filed, if triable therein; if not, before the court to which it is removed or transmitted."

He further relies on Koch v. Keen, 124 Okl. 270, 255 P. 690, and Rath v. LaFon, Okl., 431 P.2d 312 (Feb. 21, 1967).

We are of the opinion that the decision rendered in Rath v. LaFon, supra, is decisive of this issue, where, in the body of the opinion, the Supreme Court of the State of Oklahoma, held:

> " * * * we hereby determine that all acts, order, decrees and judgments of the Honorable John Porter entered and/or performed by him in the capacity and while acting as Judge of the Court of Special Sessions of Oklahoma County which have now become final, as well as those similar acts of said court which may attain final status prior to this decision becoming final, are decreed to be valid acts of said judge of said court to the same extent as if the acts were those of a de jure judge of a de jure court.

> Since we have herein determined that all judgments of the said Honorable John Porter as Judge of the Court of Special Sessions were and are valid to the same extent as the acts of a de jure judge, the law is clear beyond the necessity to cite authority that such acts may not be made the subject of collateral attacks."

We are of the opinion, and therefore hold, in the light of Rath v. LaFon, supra, that the acts of Judge Porter in

conducting the preliminary hearing on the 28th day of July, 1965, and holding the defendant bound over to the District Court, were acts of a de facto judge having the same status as the acts of a de jure judge. Moreover, we are of the further opinion that in order to preserve this question, the defendant should have challenged the jurisdiction of Judge Porter in the trial court, excepted to the ruling of the trial court, preserved this in his Motion for New Trial, in which event we would have the question properly before us for review on appeal, for we have repeatedly held that only those questions which were raised in the trial court and on which adverse rulings were made and exceptions taken, and which are then incorporated in a Motion for New Trial and assigned as error in the Petition in Error, will be considered on appeal. See Guthrey v. State, Okl.Cr., 374 P.2d 925, and Grant v. State, Okl.Cr., 385 P.2d 925.

 Defendant further contends "That the Court erred in proceeding to try the Plaintiff in Error without an indictment or action of a Grand Jury, over his objections and exceptions." He relies on the Fifth Amendment to the Constitution of the United States, which reads, as follows:

"No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

He further relies upon the Fourteenth Amendment to the Constitution of the United States, Section 1, which reads as follows:

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

Defendant's argument is apparently premised on the proposition that a defendant in a felony case cannot be proceeded against by information, but must be proceeded against by indictment. Article 2, Section 17 of the Oklahoma Constitution provides in relevant part that:

"No person shall be prosecuted criminally in courts of record for felony or misdemeanor otherwise than by presentment or indictment *or by information.* * * *" [Emphasis added]

In construing this section in relation to the Fifth and Fourteenth Amendments to the Constitution of the United States, this Court stated in Sisson v. State, Okl.Cr., 426 P.2d 379:

"The second proposition has been passed on many times by this Court. In the early case of In re McNaught, 1 Okl.Cr. 528, 99 P. 241, in an opinion dealing exhaustively with this contention, this Court concluded that under Article 2, § 17 of the Constitution of the State of Oklahoma, prosecutions may be by indictment or information as they are alternative modes and that a prosecution by information does not violate either the 14th or 5th amendment of the Constitution of the United States. See also Berryman v. State, Okl.Cr., 283 P.2d 558; Pierro v. Turner, 95 Okl.Cr. 425, 247 P.2d 291; Jordan v. Turner, 95 Okl.Cr. 307, 245 P.2d 748."

In accordance with the authorities cited above, we must hold that this assignment of error is wholly without merit.

This leads us to a consideration of defendant's assignment of error set forth in his brief as follows:

"That the Court erred by requiring the Plaintiff in Error to select a Jury from a list of approximately fifty (50) Volunteer Jurors, who agreed to remain for the purpose of selecting a Jury for this case, after approximately One Hundred (100) prospective Jurors were arbitrarily excused. That no jury was empaneled in any fashion resembling the normal and ordinary procedure as required by law.

AUTHORITIES:

Plaintiff in Error relies on Title 38 O.S.A. 23 through 33 inclusive, wherein the method of selecting a Jury for the trial of a case before the Courts of the State of Oklahoma, are set forth by statutory provisions.

ARGUMENTS:

That the selection of a jury from a voluntary list or group of prospective jurors after the rest of the entire venire had been excused from service constituted a violation of the laws of the State of Oklahoma, as set forth in the Statutes thereof, as herein set out. That the jury for the trial of a case must according to law be selected from the entire venire of prospective jurors, in the manner set forth in our statutes.

That by reason whereof, the Constitutional rights of Plaintiff in Error were seriously violated in that he could not receive a fair and impartial trial. These prospective jurors were volunteers, curiosity seekers, or those of warped or inflamed minds to such an extent as to deprive any person coming before them, the benefit of a fair and impartial trial. That they were sadistically inclined, volunteering to sit on a Murder Case, rather than to have a Jury Panel selected from the number of prospective jurors in the ordinary and normal manner, and thus take their chances of not being selected at all to serve on this type of case. It is the further contention of Plaintiff in Error that he could not receive a fair and impartial trial for the reason that no member of his race was included on said jury. The Records will show that out of the Fifty (50) prospective jurors, one, (1) member of the Negro Race was included, but was excused from service upon this jury. Plaintiff therefore could not be tried by a jury of his peers, as required by law, since no member of his own race was permitted to serve on the jury in this case.

Plaintiff therefore could not be guaranteed the protection given by the Constitution of the United States, and the Constitution of the State of Oklahoma."

■ Mr. Charles Owens, Assistant Attorney General, in his brief, succinctly and amply answers this proposition, which we hereby adopt.

"Counsel points out, and the record somewhat bears him out, that the judge who was acting as presiding judge at the time this defendant came on for trial, sent approximately 50 veniremen to the courtroom of Judge Boston Smith, who tried this case, and excused the balance of the veniremen, consisting of approximately 100 persons. There is absolutely no proof in this record, however, that the 50 veniremen from whom the defendant's jury was selected were 'volunteer jurors,' as counsel suggests in his brief. To the contrary, defendant's trial counsel when advising the court of how the matter came to his attention, stated this (CM 124):

'One of the elevator girls asked one of these fifty if you have to stay and he said, "What do you think the mean look on my face is for?"'

This alleged statement by one of the 50 veniremen indicates that the fact that he was among those being sent to Judge Smith's courtroom was in no manner voluntary on his part.

Counsel, in submitting that the defendant was prejudiced in some way by this procedure, simply directs this court's attention to 38 O.S.1961 §§ 21–33 and in effect asks the court to determine wherein any or all of these statutes were not complied with

and to further determine how the defendant was harmed by any departure from the procedure therein outlined. Said statutes, however, merely relate to the manner in which the entire venire must be summoned for jury duty and to the procedures that must be followed prior to the time the trial judge actually takes over the process of impaneling the trial jury. No complaint is evidently made by counsel as to any of these preliminary procedures, so that a citation of these statutes is meaningless as to the question presented here.

More in point with counsel's contention are the provisions of 22 O.S.1961 §§ 593–600 relating to the actual preparation of the ballots containing the names of the jurors by the clerk of the trial judge, and the intermingling of the names and drawing of same from the box by such clerk. It will be noted that said statutes do not make the requirement that the names of the jurors, in all instances, be drawn from the entire list of jurors comprising the jury venire. We submit that this would be an unreasonable requirement and one that would completely thwart the handling of jury trials in multi-court counties such as Oklahoma and Tulsa counties, where several courts may be in the process of impaneling juries simultaneously. Under counsel's theory this would be impossible, for the entire venire and their individual ballots would have to be sent to a particular court, and only after a jury was selected could the remainder of the venire then be sent to another court.

Fortunately, although there is no specific statute in this area that approves substantial compliance (such as 38 O.S.1961 § 29 relating to the summoning of the venire), this court has been of the opinion that substantial compliance with the statutes dealing with the impaneling of a jury is sufficient where any deviation is not prejudicial. See Young v. State, 41 Okl.Cr. 226, 271 P. 426, and Michael v. State, 42 Okl. Cr. 124, 274 P. 900.

Assuming there was a deviation here from the strict language of the applicable statutes, and we submit that there was not, still the defendant cannot show that he was prejudiced. The ultimate question sought to be reached in an attack on the manner in which a jury was selected is whether those twelve persons finally selected to hear the case were fair and impartial. Voir dire examination is, of course, designed to assure this. No complaint was made by trial counsel as to the jury finally selected nor is such complaint now made. To the contrary, see this language between trial counsel and the court after the jury was selected and prior to the time that they were permitted to separate overnight before the trial commenced the following morning:

'MR. WHITE: Does Your Honor propose to permit them to separate?

THE COURT: Do you have an objection?

MR. WHITE: *Well, this looks like an honorable Jury to me* but I want you to impress them with the fact now that the things that they read about in the papers are not to be committed on this Jury.' (emphasis added)

Again, there is no showing here, nor has there ever been an offer of proof made, that the twelve jurors who heard this case, or any of them, were less than fair and impartial. The fact that they found the defendant guilty and assessed the death penalty does not provide such proof.

In this same area of his brief counsel submits to the court that he was not tried by a jury of his peers, in that no member of the Negro race served on his jury and there was only one member of the Negro race included in the panel of approximately fifty jurors from which his jury was selected. This argument must fail, the state submits, because it lacks one essential ingredient, that being proof or offer of same that a scheme of discrimination existed in Oklahoma County and in the trial court, whereby Negroes were systematically excluded from jury duty generally in the county and/or specifically from service on the jury that tried the defendant. The mere fact that no Negro served on his jury is insufficient, standing alone.

In the case of Swain v. Alabama, 380 U.S. 202, 13 L.Ed.2d 759, 85 S.Ct. 824, the Supreme Court of the United States had occasion to consider the allegation of a Negro, who had been convicted of rape by an all-white jury, that he was denied equal protection of the laws by discriminatory jury selection in three respects: (1) discrimination in the selection of venires, demonstrated by the fact that while 26 percent of the persons eligible for jury duty were Negroes, the venires contained only 10 to 15 percent Negroes; (2) discrimination in the selection of jurors from the veniremen, demonstrated by the fact that the prosecutor used his peremptory strikes in his case to remove all Negro veniremen; and (3) discrimination in the use of the peremptory strike system in Talledega County through the years, perverting its purpose in a scheme to exclude all Negroes from ever serving on petit juries there.

In affirming that conviction, the Supreme Court first set out the general rule in the syllabus of the opinion as follows:

'1. Although a Negro defendant is not entitled to a jury containing members of his race, a state's purposeful or deliberate denial to Negroes on account of race of participation as jurors in the administration of justice violates the equal protection clause.

\* \* \* \* \* \*

3. The Federal Constitution forbids the intentional exclusion from juries of any identifiable group in the community which may be the subject of prejudice, whether or not the group is composed of Negroes.'

These pertinent syllabi then follow:

'7. A defendant in a criminal case is not constitutionally entitled to demand a proportionate number of his race on the venire or jury roll from which petit jurors are drawn; neither the jury roll nor the venire need be a perfect mirror of the community or accurately reflect the proportionate strength of every identifiable group.

8. The Federal Constitution does not require proportional representation of races and nationalities on juries, and does not permit proportional limitation of races and nationalities on juries.

\* \* \* \* \* \*

22. The presumption that a prosecutor used the state's peremptory challenges to obtain a fair and impartial jury is not overcome by allegations that in the case at hand all Negroes were removed from the jury or that they were removed because they were Negroes.'

The court in that case rejected a much stronger argument and much stronger proof than is submitted here. Counsel in the case at bar would be hard put to show a systematic exclusion of Negroes from juries in Oklahoma County, where Negroes regularly comprise a goodly portion of the venires summoned for jury duty and where they regularly are selected on both grand and petit juries."

▆ In accordance with the authorities cited, supra, we are of the opinion that this assignment of error is not supported by the record.

Since the defendant's first and third assignments of error relate to the refusal of the trial court to admit certain hospital records of the Veterans Administration, relating to the diagnosis of the defendant's mental condition prior to the commission of the crime of which he stands convicted, we will combine these assignments of error under the single proposition—Did the trial court err in refusing to admit the Veterans Administration records of the defendant relating to his mental condition prior to the commission of the crime?

The following proceedings, appearing in the case made at pages 211–221, form the basis of this assignment of error:

"ARTHUR F. MYER

the witness, having first been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. WHITE:

Q. State your name please, sir.

A. Arthur F. Myer.

Q. Your official position if any?

A. I am the Chief Registrar of the Veteran's Administration Hospital of Oklahoma City.

Q. You are the keeper of the records at the Veteran's Hospital?

A. Yes, sir, I am.

Q. Mr. Myers, do you know the subject of this trial, Master here?

A. Yes, sir, I have heard of him.

Q. Was he in your institution?

A. He was on several occasions.

Q. What was he treated for?

MR. McKINNEY: Just a moment if the Court please, may I ask this witness a qualifying question?

THE COURT: Very well.

MR. McKINNEY:

Q. Did you ever treat this Defendant?

A. I did not.

MR. McKINNEY: You did not. We object at this time to any testimony by this witness as to any treatment he did not perform himself.

MR. WHITE: We have a statute directly on the question. I brought it to Your Honor.

MR. McKINNEY: The law doesn't take our right away from us as to cross examination as to any alleged mental condition.

MR. WHITE: 12 O.S. 499.

THE COURT: 12 O.S. 499?

MR. WHITE: 12 O.S. 499. We have an exemplified copy to be introduced into the record.

BY MR. WHITE: (continuing)

Q. Now Mr. Myers, while the Judge looks at the statute. I would like to ask you another question.
Do your records show under whose direction, supervision or observation the Defendant was?

A. They do.

Q. Sir?

A. They do.

Q. I didn't understand you.

A. They show under whose supervision it was.

Q. Who was the doctor?

A. Dr. Kapland.

Q. Is he any longer with you?

A. He is not.

Q. You don't know where he is?

A. I understand he is in the military.

Q. Sir?

A. I understand he is in the military.

Q. Where?

A. In the navy.

Q. In the navy, that is my information, too, and not now available to testify.

Testifying from your records and you have the original records before you, don't you?

A. I do.

MR. McKINNEY: If the Court please, we still have an objection to anything that this witness might testify to. I notice there is another doctor there, Dr. Ulrich (spelling) U-l-r-i-c-h, is he in Oklahoma City?

THE WITNESS: As far as I know he isn't, sir.

MR. WHITE: No, he isn't here.

MR. McKINNEY: I don't believe the law permits our right to cross examination on this report submitted to be—

THE COURT: Objection will be sustained.

MR. WHITE: You mean he can't testify?

THE COURT: Of what he knows of his own knowledge.

MR. WHITE: Sir?

THE COURT: Of what he knows of his own knowledge.

MR. WHITE: Well, I just want him to say,—these are the records if he knows from the records what he was there for.

THE COURT: This statute simply provides the means by which the records of the United States Government can be authenticated.

MR. WHITE: All right.

BY MR. WHITE: (continuing)

Q. I believe, you have the report in your hand?

A. I do.

Q. Sir?

A. I do, sir.

Q. Have you made an exemplified copy of that record?

A. I have—

Q. Within the last day or two?

A. (Continuing) Have made a copy upon request of the narrative summary of this patient's hospital treatment for the last period of his hospitalization.

Q. Is it complete and accurate?

A. The summary is complete and accurate, sir.

MR. WHITE: We offer in evidence the original record and ask your Honor to permit us to withdraw it and substitute an exemplified copy.

MR. McKINNEY: To which the State objects as not being the same as the original copy.

MR. WHITE: Sir?

THE COURT: Not being the same as the original copy.

The Court is going to sustain the State's objection on the ground that these records are not the best evidence.

MR. WHITE: Well, the best evidence, they are the best available. The man is in the navy.

THE COURT: May well be.

MR. WHITE: And has been for some time and the statute expressly provides that these are admissible in evidence.

THE COURT: The same as the original copy.

MR. WHITE: All right, the original records are admissible where it is the best evidence available.

THE COURT: The Court will sustain the State's exhibit [sic].

MR. WHITE: Sir?

THE COURT: The Court will sustain the State's exhibit [sic].

MR. WHITE: Now would the Court give us twenty-four hours to apply to the Supreme Court for a Writ of Mandamus and save us all a lot of time and a lot of money?

THE COURT: I don't know of any procedure that warrants the delay of a trial for such purpose.

MR. WHITE: Well, there is such procedure.

MR. McKINNEY: Where is it?

MR. WHITE: Where the interest of justice would be served.

THE COURT: What is the State's position?

MR. McKINNEY: The State's position is that our witnesses have all been here and put on the stand and subject to cross examination of the defense and we feel like the State has the same rights on cross examination on any point involving the case whether it involves sanity or whether he did or did not do it.

The State objects to any continuance. The State is ready. We have presented our testimony and the Defendant knew this case was coming up.

Now he had the right to subpoena any doctors he wanted to no matter what part of the country the doctor was in.

MR. WHITE: You can't issue a subpoena except coextensive with the State.

THE COURT: A Deposition could have been taken.

MR. WHITE: Depositions can't be taken on a man in the navy.

MR. McKINNEY: There are statutory provisions.

THE COURT: Well, the motion for continuance—

MR. WHITE: All right, it is your responsibility. You are the man that is trying the mad man and not me.

THE COURT: I understand that, Mr. White.

The motion for continuance will be denied.

MR. WHITE: Sir?

THE COURT: The motion for continuance will be denied.

MR. WHITE: All right and will you permit the introduction into evidence of the original records?

THE COURT: No, sir, it is not the best evidence.

MR. WHITE: Well, I don't know—

BY MR. WHITE: (Continuing)

Q. I believe you stated that Dr. Kapland is gone?

A. Yes, sir.

Q. And, no longer with you?

A. Yes, sir.

Q. And, the records of your department show that he is in the United States Navy?

A. Yes, sir.

Q. Do you know where he is stationed?

A. No, sir, as I remember he left in July of 1965.

Q. Sir?

A. As I remember he left in July of 1965 for the navy.

MR. WHITE: All right, we offer the records.

THE COURT: You may step down, sir.

MR. WHITE: Wait, I would like to ask you this, doctor, take the stand just a moment more.

BY MR. WHITE: (Continuing)

Q. Have you made an accurate exemplified copy of that record?

A. I have.

Q. I will ask you if Defendant's Exhibit 1 is that copy?

A. This is a copy of the final narrative summary for a period of hospitalization from November 8—

MR. McKINNEY: Now if the Court please, we object to any testimony in reference to the records.

THE COURT: That's correct. Does the counsel for the State care to examine as to authentication. He is trying to make an offer of proof here.

MR. McKINNEY: Oh, just a moment. I am afraid it is not a legible copy if the Court please, and we object to it not being a legible copy. Illegible in parts.

THE COURT: Let me see it, Casey.

(THEREUPON, the exhibit was handed to the Court.)

BY MR. WHITE: (Continuing)

Q. Now doctor, will you answer the question. Will you please sir, is the Defendant's Exhibit No. 1 an accurate copy of those records?

A. It is.

Q. Sir?

A. It is.

MR. WHITE: It is. We offer Defendant's Exhibit No. 1 into evidence.

MR. McKINNEY: The State objects for the reasons formerly stated, it waives our right for cross examination.

THE COURT: Mr. Myer, where is the authentication?

THE WITNESS: I haven't been asked—well, what is the need to authenticate it, sir?

MR. WHITE: It is an exemplified copy the State gives you. That is on the bottom there.

THE COURT: I mean of any type of certificate that it is a true copy.

THE WITNESS: Well, I don't have any certificate that it is a true copy. No, sir, I don't.

THE COURT: All right, that is just a photostatic copy.

THE WITNESS: Yes, sir, it is.

THE COURT: Without any authentication of any kind.

THE WITNESS: Yes, sir.

THE COURT: Any further questions of this witness?

MR. WHITE: (Continuing)

Q. You have compared the photostatic copy with the original and it is correct?

A. Yes, I believe it is.

Q. And, you are the keeper of those records?

A. I am, sir.

THE COURT: All right, the Court will deny it on the grounds previously stated and on the additional ground that the record is not properly authenticated.

MR. WHITE: Exceptions.

THE COURT: Exceptions.

MR. WHITE: That is all.

THE COURT: You may step down, Mr. Myer."

It is the defendant's contention now, as it was at the time of trial, that the records were admissible under the provisions of 12 O.S. § 499, the same providing:

"Exemplifications from the books of any of the departments of the government of the United States, or any papers filed therein, shall be admitted in evidence in the same manner and with like effect as the originals, when attested by the officer having the custody of such originals."

Defendant also relies on 12 O.S. § 501, which provides:

"Entries in books of acount may be admitted in evidence, when it is made to appear by the oath of the person who made the entries, that such entries are correct, and were made at or near the time of the transaction to which they relate, or upon proof of the handwriting of the person who made the entries, in case of his death or absence from the county, or upon proof that the same were made in the usual course of business."

An examination of the excluded records of the Veterans Administration Hospital reveal that they are in narrative form and contain conclusions and the opinion of Dr. Leonard Kapland relating to the psychiatric condition of the defendant. The defendant has cited several cases wherein this Court and the Supreme Court of the State of Oklahoma, have approved the introduction of properly authenticated public records, but has not cited a single instance where this Court, or the Supreme Court, has approved the introduction into evidence of the properly authenticated records of a psychiatrist or physician which contain only the expressions of their opinion or diagnosis of a mental or physical condition. To the contrary, the Supreme Court has held inadmissible the diagnosis of the cause of death made by pathologists after performing an autopsy when the pathologist was not present in court and subject to cross examination by the opposing party. See Horn v. Sturm, Okl., 408 P.2d 541. In the recent case of Robison v. State, Okl.Cr., 430 P.2d 814, we held that the trial court committed reversible error where, over the objection of counsel for defendant, the trial court permitted the introduction of the service record of an accused, which contained opinion evidence relating to the physical and mental condition of the accused. In holding that such evidence was inadmissible, we stated:

"* * * There is yet another reason why the admission of this portion of the medical record was improper, for it violates the provisions of Article II, § 20 of the Oklahoma Constitution which provides in part that a defendant has a right to be confronted by the witnesses appearing against him. The purpose of this constitutional guarantee is to insure to every person tried for the commission of a crime the right to cross-examine persons making statements which are admitted into evidence against the defendant. * * *"

We believe that it is elementary that if the defendant has a right to cross-examine witnesses in a criminal prosecution, the State has the same right.

■ To summarize our holding in the instant case, we are of the opinion that the hearsay written opinion of a psychiatrist or physician is not admissible under either the provisions of 12 O.S. § 499, or 12 O.S. § 501, supra, merely because it has been properly authenticated under the provisions of those statutes, when the psychiatrist or physician is not present in court and subject to cross-examination by the adverse party. In order to be admitted

into evidence under the provisions of 12 O.S. § 499 and 12 O.S. § 501, the authenticated public records must otherwise be admissible and hearsay statements as to opinions are not rendered admissible where the declarant is not present in court and the opposing party has no opportunity to cross-examine.

■ Defendant, in his brief, lastly contends that the trial court coerced the jury into returning a verdict of guilty when, after the jury had deliberated some "twelve and one-half hours" the court returned the jury to the courtroom and instructed them to further deliberate.

We have carefully examined the record in connection with this assignment of error, and find nothing improper in the conduct of the trial court. Moreover, we observe that the time which the jury had deliberated had not exceeded eight and one-half hours. In instructing the jury to further deliberate, the trial court meticulously and scrupulously informed the jury, concluding with these words appearing at page 364 of the case made:

> "I again repeat, you are the judges of the facts, the Court is the judge of the law. In all statements made to you I have not, nor do I now, express or intimate, nor indicate, in any way the conclusions to be reached by you in this case. Nor do I intend in any way or manner to coerce a Verdict, nor directly or indirectly, to attempt to force a Verdict in this case. I only ask that you return to your Jury Room and again, diligently and earnestly, under your oaths, resume your deliberations."

We are of the opinion that the record does not support this assignment of error.

In oral argument before this Court, appellant counsel for defendant reluctantly argued that because of trial counsel's advancing years, he did not present evidence which would have cast further light on the defendant's mental condition prior to the homicide of which he stands convicted.

Counsel further alluded to the failure of the defendant's trial counsel to interpose proper objections to the admission of certain evidence which tended to enflame the jury. In short, counsel concedes that there was no doubt that the defendant committed the homicide, but that errors of omission and commission so enflamed the jury that it caused them to impose a greater punishment than would have been imposed by another jury under similar circumstances, absent these errors.

■ We have carefully examined the record in the instant case, and are of the opinion that from the totality of circumstances, and on the record before us, the defendant committed the homicide of which he stands convicted, but that under the unusual circumstances of this case, justice would best be served by modifying the judgment and sentence from death in the electric chair to a term of life imprisonment in the State Penitentiary, and as so modified, the judgment and sentence should be, and the same is hereby, affirmed.

For cases wherein death sentences were modified see Mitts v. State, Okl.Cr., 345 P.2d 913 (a case not dissimilar to this one); Moore v. State, 75 Okl.Cr. 222, 130 P.2d 114; Murphy v. State, 72 Okl.Cr. 1, 112 P.2d 438; Benton v. State, 86 Okl.Cr. 137, 190 P.2d 168; Easley v. State, 78 Okl.Cr. 1, 143 P.2d 166.

Judgment and sentence modified from death in the electric chair to life imprisonment, and as so modified, affirmed.

NIX, P. J., concurs.

BRETT, Judge (specially concurring).

I concur with the results arrived at in Judge BUSSEY's opinion herein, but instead of reducing the sentence from the death penalty to life imprisonment, I would modify the sentence as was done in Mitts v. State, Okl.Cr., 345 P.2d 913, to ninety-nine (99) years imprisonment in the State Penitentiary.