1998 OK CR 61

1999 OK CR 18

**Curtis Edward McCARTY, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

**No. F–96–503.**

Court of Criminal Appeals of Oklahoma.

Nov. 6, 1998.

Rehearing Denied April 26, 1999.

Michael T. Wilson, Joseph Ruffin, Oklahoma Indigent Defense System, Capital Trial Division, Norman, for Appellant at trial.

Robert H. Macy, District Attorney, Ray Elliot, Asst. District Attorney, Oklahoma City, for the State at trial.

Matthew D. Haire, Oklahoma Indigent Defense System, Capital Direct Appeals Division, Norman, for Appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Jennifer B. Miller, Assistant Attorney General, Oklahoma City, for the State on appeal.

### OPINION

LUMPKIN, J.:

¶ 1 In the early morning hours of December 10, 1982, eighteen year old Pamela Willis was brutally murdered. Over three years later, Appellant Curtis Edward McCarty was tried for Ms. Willis' murder by a jury in the District Court of Oklahoma County, Case No. CRF–85–2637. Appellant was convicted of First Degree Murder and sentenced to death. He appealed his conviction to this Court in Case No. F–86–343. We reversed and remanded for a new trial, finding the record "replete with error committed during both stages of the trial. . . ." *McCarty v. State*, 1988 OK CR 271, 765 P.2d 1215, 1222.

¶ 2 Appellant was retried in September of 1989. For a second time, Appellant was convicted of First Degree Murder and sentenced to death. For a second time, Appellant appealed. On this occasion, we affirmed Appellant's murder conviction. *McCarty v. State*, 1995 OK CR 48, 904 P.2d 110 (Lumpkin, J., concurring in part, dissenting in part). However, we reversed Appellant's death sentence and remanded for a new sentencing stage proceeding because the trial court had refused to instruct the jury on the requested alternative sentencing option of life imprisonment without parole.

¶ 3 Appellant's resentencing proceeding was held in April of 1996 as a jury trial. For the third time, Appellant's jury recommended death. The trial court sentenced Appellant accordingly. Appellant has now perfected his third appeal with respect to his death sentence.[1]

¶ 4 The facts relevant to Appellant's conviction for First Degree Murder are thoroughly discussed in *McCarty v. State*, 904 P.2d 110. We will not restate them here, except as may be necessary in our review of Appellant's twenty propositions of error relating to the resentencing proceeding.

¶ 5 In his first and ninth propositions of error, Appellant claims his constitutional rights[2] were violated when the trial court limited his resentencing jury from hearing evidence regarding Appellant's personal culpability for Pamela Willis' death. Appellant argues the trial court operated his resentencing trial under the erroneous assumption

---

1. Appellant's Petition in Error was filed in this Court on October 28, 1996. Appellant's brief was filed on August 15, 1997. The State's brief was filed on December 11, 1997, and Appellant filed a reply brief on December 31, 1997. The case was submitted to the Court on January 6, 1998, and oral argument was held on May 26, 1998.

2. Appellant claims he was denied rights guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution.

that his guilt stage jury had determined Appellant personally stabbed, suffocated, and raped Pamela Willis.[3] He also claims the trial court in the resentencing stage "built an evidentiary blockade that both insulated the State's case from attack and pushed aside powerful mitigating circumstances relevant to Mr. McCarty's death eligibility."

¶ 6 In addressing these issues, we begin by reviewing important rulings made by the trial court in response to Appellant's pretrial motions. These rulings indicate the "evidentiary blockade" of which Appellant now complains appears to have been due in large part to Appellant's own trial strategy.

¶ 7 On March 29, 1996, Appellant filed a motion in limine.[4] Therein, Appellant argued, "Title 21, Section 701.10a states that a resentencing shall consist of evidence of mitigation, aggravation, and victim impact. Guilt has already been determined, and any evidence pertaining thereto is irrellevant [sic]." During a pretrial motion hearing regarding this motion, defense counsel stated Appellant "would object to any evidence that pertains to the defendant's guilt or innocence as being unrelated to second stage issues. We are not here to retry the first stage. We're here to try to prove either aggravators or mitigators and introduce victim impact statements." Defense counsel later explained the motion sought to exclude evidence "strictly pertaining to guilt, and not to any issue in the second stage." The State responded as follows:

> [A]ll of the evidence that we tend to introduce will go to one of the listed aggravating circumstances. Now it may have also been used to determine guilt in the first stage, but albeit, we're certainly not prohibited in any trial … at least any two stage trial in which the death penalty is being sought, from using evidence in both stages.

Nevertheless, the motion in limine was sustained by agreement after defense counsel offered the following:

If the evidence came from the first stage, but it's also related to some second stage aggravator, I have no objection. But if it came from the first stage and has no relevance to an aggravator, then I would object. Such as evidence of identification, stuff like that. I would object to that. Confessions.

¶ 8 After reviewing the context of the motion in limine and the arguments presented by both sides concerning its meaning, the record reflects defense counsel, as a matter of trial strategy, sought exclusion of any first stage evidence which did not relate to a statutory aggravator. As defense counsel put it, evidence relating to guilt, innocence, identification, or confessions would be irrelevant.

¶ 9 First stage evidence may be incorporated into the sentencing stage. *Cleary v. State*, 1997 OK CR 35, 942 P.2d 736, 751, *cert. denied*, —— U.S. ——, 118 S.Ct. 1528, 140 L.Ed.2d 679 (1998); *see also McCracken v. State*, 1994 OK CR 68, 887 P.2d 323, 331, *cert. denied*, 516 U.S. 859, 116 S.Ct. 166, 133 L.Ed.2d 108 (1995); *Parks v. State*, 1982 OK CR 132, 651 P.2d 686, 694, *cert. denied*, 459 U.S. 1155, 103 S.Ct. 800, 74 L.Ed.2d 1003 (1983). Indeed, this is the preferred practice. Oklahoma law provides that "[a]ll exhibits and a transcript of all testimony and other evidence properly admitted in the prior trial and sentencing shall be admissible in the new sentencing proceeding." 21 O.S.Supp.1993, § 701.10a(4) In *Parks*, this Court held that the receiving of first stage evidence into the second stage conforms fully to the mandate of *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), that the sentencer consider not only the defendant's record and character but any circumstances of the offense. *Parks*, 651 P.2d at 694. Thus, our statutes and jurisprudence clearly recognize the sentencing phase of trial "in no way excludes from consideration … matters heard on the issue of guilt or

---

**3.** Appellant was originally charged with an unknown accomplice, "John Doe." During the guilt stage, the State argued the criminal acts were committed by either Appellant or John Doe, with the other aiding and abetting. Because alternative theories were used, Appellant alleges his conviction did not require the jury to determine

the level of his personal culpability for the acts of stabbing and suffocating Ms. Willis.

**4.** The motion in limine was entitled, "Objection to Any Evidence Strictly Pertaining to Guilt While Having No Relevance to Any Aggravator Listed by the State."

innocence." *Stout v. State*, 1984 OK CR 94, 693 P.2d 617, 628, *cert. denied* 472 U.S. 1022, 105 S.Ct. 3489, 87 L.Ed.2d 623 (1985) (citation omitted).

¶ 10 Here, however, only part of the first stage evidence and testimony was admitted in the sentencing trial.[5] We cannot say what defense counsel's precise reasons were for seeking to limit the introduction of first stage evidence to the sentencing jury.[6] Whatever the reason, this Court will not second-guess matters concerning trial strategy if there is a reasonable basis for counsel's actions. *Roberts v. State*, 1996 OK CR 7, 910 P.2d 1071, 1080; *Robinson v. State*, 1995 OK CR 25, 900 P.2d 389, 405.

¶ 11 With respect to Appellant's resentencing proceeding, the allegation of an "evidentiary blockade" primarily concerned Appellant's cross-examination of Oklahoma City police officer Bob Horn. Officer Horn was called as a witness for the State.[7] He testified regarding his investigation of the crime scene, including evidence of a forced entry through a window, evidence found at the crime scene, and stab wounds received by Ms. Willis. He also identified several photographs of the victim and crime scene which were admitted into evidence.

¶ 12 During cross-examination, Appellant's counsel asked Officer Horn if he was aware a John Doe had also been charged in the case. Horn said his personal recollection was that only one person had been charged. Horn could not say who wielded the knife. Appellant's counsel then began questioning Horn about fingerprint evidence in relation to a crime scene window which had been forced open. Specifically, Appellant's counsel asked whether anything "ever came up, then, as far as John Doe's prints." The State objected, and a bench conference was held.

¶ 13 The State claimed defense counsel was "trying to prove identity". The State argued, "We object to any questioning along the lines of John Doe or identity or who has been identified. The jury has been told. He was not only identified, but he is convicted. We object to this as going to the issue of identity." In response, defense counsel offered the following:

> I never said Mr. McCarty is not guilty. What we are dealing with is aggravators.... The Information reads John Doe. I have a duty to bring up the inference that these aggravators that they're trying to prove could be someone else. Whether Mr. McCarty was involved, that has been decided, but as to actually choking the woman and finding fingerprint evidence, I have every right to ask as far as fingerprints.

The State then argued, "The jury has convicted him of killing her by stabbing her, not by John Doe stabbing her .... the State objects to [this] line of questioning, trying to imply that someone else had done it while the jury has found not once, but twice that he did it himself." Thereafter, the trial court sustained the State's objection based on relevance. The trial court found the issue of whether or not the State had proven Mr. McCarty was the person who stabbed or murdered Ms. Willis had "been made by a jury prior to this date, by finding him guilty of malice aforethought murder."

¶ 14 Appellant claims this ruling was both a denial of due process and his right to confront the State's witnesses. He also claims the State "took advantage" of the ruling by repeatedly arguing Appellant had personally committed the crimes.

■ ¶ 15 Appellant correctly points out this Court has previously held "[t]he right of

---

5. The record reflects fourteen exhibits were admitted in the second stage proceeding, as opposed to seventy in the first stage. The fourteen exhibits included eleven State exhibits (five photographs, four autopsy diagrams, a judgment, and an agreement), one Defense exhibit (a judgment), and two exhibits from the trial court (an obituary and a jury note). None of the first stage trial testimony was presented to the sentencing jury.

6. The most obvious purposes would be to detract from the grisly nature of the crime, to prevent the jury from hearing evidence connecting Appellant to the crime, or to focus the jury's attention on matters of mitigation.

7. In December of 1982, Officer Horn had been a police officer with the homicide division of the Oklahoma City police department. In that capacity, he had assisted in the crime scene investigation of Pamela Willis' murder.

cross-examining witnesses is the most valuable right given by law and it may be reversible error to deprive the defendant of this right." *Megown v. State*, 1956 OK CR 78, 300 P.2d 673, 677. However, our cases also hold "the scope of cross-examination lies in the sound discretion of the trial court." *Reeves v. State*, 1991 OK CR 101, 818 P.2d 495, 501. We recognize the conflict between a Defendant's right of confrontation and a trial court's discretion to limit the scope of cross-examination often presents a rather delicate balancing act. However, this Court will not interfere with the trial court's decision to limit cross-examination unless there is an obvious and prejudicial abuse of discretion. *Id.*

■ ¶ 16 We see no obvious and prejudicial abuse of discretion in the trial court's decision to limit Appellant's cross-examination of Officer Horn. The testimony Appellant sought from Horn was only slightly relevant at best.[8] While Appellant claims the trial court prevented him from addressing Appellant's lack of personal culpability, Appellant has not pointed us to anywhere in the record, other than Horn's cross-examination, where Appellant sought to introduce such testimony.[9] Instead, Appellant points us to places in the record where the State argued, without a contemporaneous defense objection, that Appellant personally committed the crime.

¶ 17 Appellant argues at length regarding our aider and abettor jurisprudence and its relation to malice murder convictions. Appellant claims that, under our current jurisprudence, *Conover v. State*, 1997 OK CR 6, 933 P.2d 904, in particular, "the minimum proof necessary to sustain Mr. McCarty's conviction was evidence that he had knowledge that someone else wanted Miss Willis dead—regardless of whether he shared in

that intent, and slightly participated in the acts of John Doe." Appellant thus argues "[w]hile this may be enough to sustain the conviction, it is far short of supporting a death sentence." In other words, Appellant takes the position that his personal culpability in the murder must be shown to be much greater where death is at issue, i.e. he must be shown to be a "major participant." In support he cites *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) and *Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987).

■ ¶ 18 While Appellant's arguments are enticing, they lose their impact when viewed against the holdings of the cited cases, the specific facts of this case, and Appellant's trial strategy. First, it is important to understand *Enmund* and *Tison* were both felony murder cases, not first degree malice aforethought murder cases. Unlike felony murder, the absence of a finding of intent[10] in a malice aforethought murder will defeat a conviction at the guilt stage in Oklahoma. *Mann v. State*, 1988 OK CR 7, 749 P.2d 1151, 1161, *cert. denied*, 488 U.S. 877, 109 S.Ct. 193, 102 L.Ed.2d 163 (1988). To apply the *Enmund* criteria and its progeny in a malice aforethought murder at the sentencing stage would be the equivalent of asking the jury to re-examine their finding of guilt. *Id.*; *see also Cannon v. State*, 1995 OK CR 45, 904 P.2d 89, 105, *cert. denied*, 516 U.S. 1176, 116 S.Ct. 1272, 134 L.Ed.2d 219 (1996). An Oklahoma jury must accept that the intent to commit murder is an established fact when they reconvene for the sentencing stage in a malice aforethought murder trial. *Mann*, 749 P.2d at 1161; *see also Romano v. State*, 1995 OK CR 74, 909 P.2d

---

8. During the guilt stage, Horn testified he observed some fingerprints on the window. However, he did not participate in the collection of the fingerprint evidence or have any knowledge with respect to the results, if any. Therefore, Appellant's offer of proof regarding whether or not there were fingerprints on the murder weapon and glass and whether such fingerprints were attributable to John Doe, has little or no relevance to Horn's testimony.

9. For example, in jury instruction 23, submitted by Appellant and addressing mitigating circumstances, no mention is made regarding Appel-

lant's personal culpability with respect to the acts of stabbing or strangling Pamela Willis.

10. We note intent was discussed in *Tison*, albeit in the felony-murder context: "the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result." *Tison v. Arizona*, 481 U.S. at 157–158, 107 S.Ct. at 1688.

92, 122, *cert. denied,* —— U.S. ——, 117 S.Ct. 151, 136 L.Ed.2d 96 (1996).

¶ 19 Additionally, Appellant's legal analysis of *Conover* is misleading. Appellant claims he "could have been found guilty as a principal who personally killed, **or** as an aider and abettor to the homicide," but fails to mention that one who aids and abets in the commission of a crime is himself a principal.[11] *See* 21 O.S.1981, § 172. In *Conover,* we held all persons concerned in the commission of a crime, whether it be felony or misdemeanor and whether they directly commit the act constituting the offense or aid and abet in its commission, though not present, are principals and are equally culpable with other principals. *Conover,* 933 P.2d at 910. To be proven guilty as a principal to the crime in a malice aforethought murder trial, "the State must prove, beyond a reasonable doubt, that Appellant himself committed the murder, i.e. that he was the perpetrator, or that Appellant aided and abetted [another] in the commission of the murder." *Id.* at 915. Proof that Appellant was the perpetrator requires evidence that he himself committed the murder with malice aforethought. *Id.* Proof that he aided and abetted in the murder requires evidence of acts, words; or gestures assisting or advising the perpetrator in the commission of the murder. *Id.*

¶ 20 Besides, Appellant's arguments regarding the alleged John Doe are a smoke screen. The record reflects Appellant is the only person who has been tried or personally accused in connection with Ms. Willis' murder.[12] While it is hypothetically possible another person was involved in this crime, this possibility presently amounts to no more than idle speculation.

 ¶ 21 Finally, we again note Appellant specifically sought to exclude any evidence relating to guilt, innocence, or identity during the resentencing trial. Appellant cannot now second guess this trial strategy on appeal.[13] While the trial court may not have fully understood Appellant's motion, this was due in large part to Appellant's own explanations of it. Appellant's first and ninth propositions of error are therefore denied.[14]

¶ 22 In his second proposition of error, Appellant claims the evidence was insufficient to support the aggravating circumstance of a previous felony conviction involving the use or threat of violence. 21 O.S. 1981, § 701.12(1). The State used Appellant's 1985 conviction for second degree rape to support this aggravator. Appellant, however, claims the State was barred from "transforming his guilty plea to second degree statutory rape into a first degree forcible rape." He also claims the use of the rape victim's "embellished version of events violated Mr. McCarty's rights under the Due Process Clause, Fifth, Eighth, and Fourteenth Amendments."

¶ 23 When Appellant was twenty-two years old, he was charged with the first degree rape of a fourteen year old girl, P.N. The State later amended the charge to second degree rape. There was some dispute whether this amendment was due to P.N.'s credibility, pleas from P.N.'s family, or mere plea negotiations. Be that as it may, the information was amended, and Appellant eventually pled guilty to, and was convicted of, second degree rape.

¶ 24 At trial, the State called the rape victim to testify the rape involved the use or threat of violence. P.N. testified Appellant: "choked me so hard I could not breathe;" "ripped my clothes off;" "stuck his penis into my vagina;" "stuck his penis ... into my anus;" "made me have oral sex with him;" made her have sex a second time; and said "if you do tell anybody, I'm going to kill you."

---

**11.** "Too often we have looked at the issue of culpability of parties to a crime in terms of what it takes to prove an accused is an aider and abettor, instead of looking at what is necessary to prove guilt as a principal." *Conover,* 933 P.2d at 916.

**12.** A murder charge was filed against Rick Terry on March 13, 1985 but was dismissed shortly thereafter.

**13.** On this point, we note Appellant's guilt stage jury heard all first stage evidence and rendered a death verdict. It is therefore reasonable for an attorney in a resentencing proceeding to seek a way to limit the amount of first stage evidence in order to achieve a different result on resentencing.

**14.** In making this ruling, we also reject the contention that Appellant was forced to choose between his right of presenting a defense and his privilege against self-incrimination.

¶ 25 Appellant begins his challenge to this aggravator by urging his second degree rape conviction was not a "previous" conviction, because the rape occurred three years after Pamela Willis' murder. However, we have previously rejected this argument, and Appellant has not convinced us to hold otherwise.[15]

¶ 26 Next, Appellant argues the State was prohibited from going behind the amended Information to prove facts deleted from the original Information in support of the prior violent felony aggravator. Appellant alleges such a practice constitutes double jeopardy or double punishment and renders 21 O.S.1991, § 701.12(1) unconstitutionally vague. In response, the State argues Appellant's successful "plea negotiations" should not prevent the State from utilizing the prior felony conviction, which involved violence, to support the prior violent felony aggravating circumstance. Both sides cite to *Brewer v. State*, 1982 OK CR 128, 650 P.2d 54, *cert. denied*, 459 U.S. 1150, 103 S.Ct. 794, 74 L.Ed.2d 999 (1983) in support of their position.

¶ 27 In *Brewer*, we recognized that, with respect to some crimes, the State may not rely solely on a judgment and sentence to prove a prior conviction involved the use or threat of violence. In situations where the crime could have been committed without the use or threat of violence, the State must offer additional evidence to meet its burden of proof:

> [T]he State is required to go beyond simple proof that a defendant in a capital case had prior felony convictions to establish

the aggravating circumstance. The State must additionally prove that the prior felonies involved the use or threat of violence to the person. The fact that the prior felonies were committed and that the defendant committed them are properly and most easily proven through the use of the judgment and sentence. However, the element that the felonies involved the use or threat of violence is not so easily and summarily proven. It is therefore necessary that the State present sufficient information concerning the prior felony convictions to support its contention.

*Id.* at 62. *Brewer* then provided an example of when "additional information concerning the nature of the prior convictions" may become necessary:

> [T]ake the example of a person who, not unlike the appellant, stands to be sentenced for murder in the first degree with a prior conviction of rape. One might be led to assume from the face of the crime that rape necessarily involves the use or threat of violence to the victim. It is possible, however, that the rape conviction stemmed not from acts or threats of violence on the part of the defendant, but through sexual intercourse with one incapable of consent. In such a case, the rape conviction would not support the aggravating circumstance.

*Id.* Thus, we established a procedure to be used when the prior violent felony aggravator is at issue and the defendant desires to stipulate that the crime meets the requirements of the aggravator, thereby preventing the State from introducing damaging evidence of the prior crime to the jury.[16]

15. *See Grasso v. State*, 1993 OK CR 33, 857 P.2d 802, 809, n. 4 (focus is not when the crime was committed but if a "conviction occurred prior to the sentencing hearing in the present case."). Besides, Appellant was not prejudiced by the jury instruction which told the jury to determine "whether at the time this crime was committed ... defendant was previously convicted of a felony involving the use or threat of violence to the person."

16. "First, ... the defendant must be given due notice of all evidence in aggravation the State intends to present; second, the judge must review the evidence proffered by the State in support of its allegation in camera to ensure that the felonies did indeed involve the use or threat of violence to the person; third, upon a finding by

the trial court that the prior felony convictions did involve the use or threat of violence to the person, the defendant must be given the opportunity to personally stipulate that the prior felony conviction(s) alleged by the State did involve the use or threat of violence to the person.... If the defendant stipulates, the State's proof of the aggravating circumstances must be limited to introduction of the judgment and sentence in the prior felonies along with the defendant's written stipulation that the felonies involved the use or threat of violence to the person. If the defendant refuses to so stipulate, the State shall be permitted to produce evidence sufficient to prove that the prior felonies did involve the use or threat of violence to the person. We emphasize that prosecutors and trial courts should exercise informed discretion in permitting only the minimal

¶ 28 The thrust of Appellant's second proposition is that second degree "statutory" rape, by definition, is not a crime involving the use or threat of violence, and therefore the State may not use a second degree rape conviction to support the prior violent felony aggravating circumstance. Appellant therefore claims his "rape conviction stemmed not from acts or threats of violence on the part of the defendant, but through sexual intercourse with one incapable of consent." *Brewer,* 650 P.2d at 62. We must reject this argument.

¶ 29 While it is true that "rape accomplished with any person by means of force, violence, or threats of force or violence, accompanied by apparent power of execution" is one of the categories of first degree rape[17], and second degree rape is confined to "all other cases," this does not mean all categories of second degree rape do not involve the use or threat of violence. Our cases include second degree rape convictions where the use or threat of violence has occurred.[18] Moreover, the position urged by Appellant asks us to ignore the reality of plea negotiations. Many first degree rape charges are reduced to second degree rape through the plea bargaining process.

¶ 30 Although *Brewer* cited second degree murder and "statutory rape" as examples where additional proof is necessary to prove the prior violent felony aggravating circumstance, we do not read *Brewer* as any sort of blanket statement that a second degree rape conviction cannot be used to support the prior violent felony aggravator. So long as the State introduces sufficient additional evidence that the crime involved the use or threat of violence, a second degree rape conviction can be used to support the aggravator.[19]

¶ 31 The remainder of Appellant's second proposition of error also fails to convince us there was insufficient evidence to support the prior violent felony aggravator. We disagree with Appellant's argument that the aggravator was supported only by an offense which the prosecutors abandoned (i.e. first degree rape)[20] or that Appellant is now being "prosecuted" a second time, thereby implicating double jeopardy or double punishment concerns. As stated above, the prosecutors properly used Appellant's second degree rape conviction to show Appellant was previously convicted of a felony *involving* the use or threat of violence. As Appellant recognizes, this Court has rejected double jeopar-

---

amount of evidence to support the aggravating circumstances." *Brewer,* 650 P.2d at 64.

17. See 21 O.S.1983, § 1114, which was the version in force at the relevant time period.

18. In *Harris v. State,* 1989 OK CR 34, 777 P.2d 1359, the Defendant, a seventeen year old, attacked and wounded the victim with a knife in front of the victim's four year old son. Defendant then raped and sodomized the victim. The defendant's conviction for second degree rape was affirmed on appeal. In *Miller v. State,* 1989 OK CR 73, 781 P.2d 846, the Defendant was convicted of second degree rape after breaking into the home of a seventy-two year old woman and subjecting the victim to nearly five hours of beating and forced sexual acts.

19. It is important to note that the statutory rape example set forth in *Brewer* assumed a factual scenario where the underage victim admittedly consented to the act of sexual intercourse. The example was purely hypothetical and was not "at issue" in the case. In that respect, we have never addressed, in a contested case, the issue of whether a second degree rape, admittedly consensual, involves the use or threat of violence based solely on the victim's inability to give con-

sent due to age. The instant case is distinguishable, however, because consent was strongly denied. Moreover, the procedures set forth in *Brewer* for stipulating to the aggravator never came into play in the instant trial because the prosecutors also sought to offer this evidence to support the continuing threat aggravating circumstance. *See Smith v. State,* 1991 OK CR 100, 819 P.2d 270, 276–278, cert. denied, 504 U.S. 959, 112 S.Ct. 2312, 119 L.Ed.2d 232 (1992).

20. Interestingly, the amended Information alleged a violation of "21 Oklahoma Statutes 1111," the general rape statute, not § 1114 which defines the differences between first and second degree rape. Specifically, the amended Information alleged Appellant "did unlawfully, wilfully, and feloniously rape, ravish, carnally know and have sexual intercourse with one P.N., a female person not the wife of the said defendant, the said female being then and there under the age of 16 years." While the term rape is a defined term in § 1111 and specifically includes "where the victim is under sixteen (16) years of age," the term "ravish" is not a defined term. However, the common law definition for ravish is "to have carnal knowledge of a woman by force and against her will; to rape." *Black's Law Dictionary* 1136, (5th ed.1979).

dy arguments when a previous conviction is relied upon to enhance punishment. *See Johnson v. District Court of Okla Co.,* 1982 OK CR 169, 653 P.2d 215, 218. Appellant has cited no persuasive authority that the second degree rape testimony was irrelevant or that our decision renders the prior violent felony aggravating circumstance unconstitutionally vague. Appellant's second proposition of error is therefore denied.

¶ 32 Appellant's third proposition of error also relates to his second degree rape conviction. Appellant claims the trial court improperly restricted his ability to rebut the rape victim's testimony concerning whether the rape was consensual or forceful. After P.N. testified Appellant forcibly raped her, Appellant called the attorney who represented him in the rape case, Gary Pitchlyn. Mr. Pitchlyn was called to testify as follows:

> He's going to say that he found information relating to P.N. bearing upon the issue of consent. That he relayed that information to the District Attorney's office and subsequently plea negotiations ensued, during which the District Attorney reduced the charges against Mr. McCarty and Mr. McCarty pled guilty.

¶ 33 The trial court refused to allow Mr. Pitchlyn to testify to the details of his investigation regarding the rape and limited Pitchlyn's testimony to "the fact that he negotiated this case to a lesser charge of rape in the second degree." The Court cited various grounds for this ruling. We do not find it necessary to address each of these grounds in this opinion. Suffice it to say that we find no error in the trial court's restriction of Mr. Pitchlyn's testimony. The testimony was in large part based upon hearsay and information which was beyond Pitchlyn's personal

knowledge. 12 O.S.1991, §§ 2801(3) & 2602. Moreover, the marginal relevance of Pitchlyn's testimony was substantially outweighed by its prejudicial effect.[21] 12 O.S.1991, § 2403. Appellant's third proposition of error is denied.[22]

¶ 34 In the fourth, fifth, and seventh propositions of error, Appellant claims the evidence used to support the continuing threat aggravator was either inadmissible or insufficient and in violation of his rights under the Fifth, Eighth, and Fourteenth Amendments. In addition to the circumstances of Pamela Willis' murder, the evidence supporting the continuing threat aggravator came from four separate sources: David Osborne testified Appellant attempted to rape and then killed seven year old Janelle Fowler; Eddie Thomason, an investigator for the Oklahoma County District Attorney, testified Appellant led him to Janelle Fowler's body; P.N. testified Appellant raped her; and Theodore Edgin testified he overheard Appellant telling cell mates that he and a buddy had sex with a girl, then stabbed and killed her.[23]

¶ 35 Concerning the testimony of David Osborne and Eddie Thomason, Appellant raises four relevant issues.[24] First, Appellant claims the State entered into a non-prosecution agreement with him concerning Janelle Fowler's murder, thereby granting Appellant full immunity from prosecution. Second, he claims the trial court refused to grant a *Jackson v. Denno*[25] hearing with respect to the voluntariness and admissibility of Appellant's statements which led the police to the discovery of Janelle Fowler's body. Third, he claims Osborne's testimony was insufficiently corroborated. Fourth, he claims the trial court should have given an instruction that Osborne was an accomplice as a matter

---

**21.** In so ruling, we do not find the issue of the rape victim's alleged consent to be irrelevant. We only hold the trial court did not abuse its discretion in restricting *Mr. Pitchlyn's* testimony. The proffered evidence did not meet the requirements we set out in *Beck v. State,* 1991 OK CR 126, 824 P.2d 385, 389 to be admissible for impeachment.

**22.** Concerning the rebuttal testimony of Assistant District Attorney Ted Ritter, we find no abuse of discretion in allowing his limited testimony. No objection was voiced by the defense, thereby waiving all but plain error.

**23.** Edgin also testified Appellant described the murdered girl as a policeman's daughter and said he was going to take care of the victim's father for pressing the issue.

**24.** Appellant raises other issues regarding Osborn's testimony, but provides no authority in support. These issues have thus been forfeited. Rule 3.5(C), *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch.18, App. (1997).

**25.** 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

of law. Appellant also attacks the weight of this evidence because Osborne had previously confessed and been prosecuted for Janelle Fowler's murder without implicating McCarty.

¶ 36 We begin with the extremely complicated circumstances surrounding the non-prosecution agreement. Seven year old Janelle Fowler was murdered on or about September 17, 1983. David Osborne was arrested and charged with the murder the following day. Appellant was interviewed by authorities regarding the murder on November 16, 1983, and he implicated Osborne as the murderer at that time. Appellant showed authorities the approximate location of the child's body on November 16, 1983, but told them he did not know exactly where the body was located. This was a lie. The following day, Appellant took a polygraph test regarding his involvement in the murder. The test results, which are not in the record, apparently indicated he had been truthful, except with respect to questions concerning his involvement in disposing of the child's body. Following receipt of the polygraph results, Appellant led authorities to the body on November 17, 1983.

¶ 37 On November 18, 1983, Appellant gave a sworn, transcribed statement[26] to Eddie Thomason, Investigator for the Oklahoma County District Attorney, regarding his knowledge of Janelle Fowler's murder. Appellant's attorney, Jerry E. Jones, was present. The sworn statement was preceded by the following representations by David Hartwicke, Assistant District Attorney:

> [T]he purpose of this today is taking a formal sworn statement of a witness in this case and this is pertaining to the case of the State of Oklahoma versus David Todd Osborne, O-s-b-o-r-n-e, and this witness, Mr. McCarty, is going to be a principal witness in this case. Prior to his having discussions with us and prior to the taking of this sworn statement, I have discussed with him potential prosecution of him concerning his involvement in this matter. I have informed him that the State is not pursuing the prosecution against him for having lied to investigators and having assisted in disposing of the little girl's body, that in reliance upon that he has come forward and is going to give this statement. I have also informed Mr. McCarty that I have had a discussion with a District Judge concerning a grant of immunity prior to any in-Court testimony and that I've informed Mr. McCarty that the District Judge that I spoke with would approve that procedure in his view of meeting the best end of justice and Mr. McCarty is relying upon these representations as is his attorney here, Mr. Jones, in giving us this statement today.

¶ 38 In his sworn statement, Appellant testified he and Osborne were living in a trailer with Janelle Fowler and Janelle's mother and step-father in September, 1983. In the early morning hours of September 17, 1983, Appellant and Osborne, who were both drunk and extremely high, decided to confront Janelle's step-father regarding rent he had been charging. When they arrived at the trailer, Appellant and Osborne found other relatives asleep inside, so they left. They went to another trailer Osborne owned, and then Osborne left in his car to get cigarettes. Appellant saw Osborne's car pass by the trailer park shortly thereafter, so he followed on foot. Appellant heard a scream from what sounded like a female voice. He followed and saw Osborne swinging a bat by his car. He walked up and saw Janelle Fowler laying motionless on the ground, naked and bleeding. Appellant then helped Osborne load the child, now dead, into Osborne's trunk, and they drove to a gravel yard, where Osborne disposed of the child's body.[27]

---

26. The sworn statement was never admitted into evidence in Appellant's original trial or his resentencing trial. However, the transcript was submitted as a "supplemental exhibit" in the appellate briefing stage with respect to Appellant's 1989 trial. Appellant filed a motion to allow the supplemental exhibits to be accepted into the record, and this Court granted Appellant's motion on September 3, 1992. A two page excerpt from the sworn statement was also attached to a pretrial motion filed with respect to Appellant's resentencing proceeding. Much of the background information relating to the non-prosecution agreement has been taken from these supplemental exhibits.

27. Oklahoma County prosecutors believe Appellant lied in this statement. Based largely on statements taken from Osborne and their evaluation of the evidence, the prosecutors believe Appellant assisted Osborne in kidnapping the child.

¶ 39 Osborne later confessed to killing Janelle Fowler. He entered a guilty plea to the charge of First Degree Murder and, upon conviction, received a life sentence. Because Osborne pled guilty, Appellant never had to testify against him. Therefore, a formal, written immunity agreement between Appellant and the prosecutors was never reached or taken to a district court judge for approval, and Appellant never invoked his privilege against self-incrimination before a court of law for the purpose of receiving a grant of immunity.

¶ 40 The day after Osborne pled guilty to the murder and was convicted, Osborne gave Oklahoma County prosecutors a tape recorded interview.[28] Osborne stated both he and Appellant had carried Janelle Fowler out of the trailer by force in order to get her to have sex with them. When Janelle refused and tried to escape, Osborne took out a baseball bat and hit her over the head. Osborne stated the child died shortly after being struck with the bat.

¶ 41 In September of 1989, during the sentencing phase of Appellant's trial for the murder of Pamela Willis, Osborne was called to testify for the State. Osborne recanted his confession and his admissions that he had swung the bat which killed Janelle Fowler. He implicated Appellant for the murder.

¶ 42 Two days earlier, the Oklahoma County District Attorney's office had filed felony murder charges against Appellant with respect to the death of Janelle Fowler, Case No. CRF–89–5242. This was approximately six years after the murder had taken place. Appellant subsequently moved to dismiss the felony murder case due to the non-prosecution agreement and promises of immunity. His motion was argued and denied in April of 1990.[29]

¶ 43 Months later, the Fowler murder charges against Appellant were dismissed after the Oklahoma County District Attorney's Office filed a voluntary motion to dismiss "pending further investigation." An Assistant District Attorney stated the case was dismissed because of the "litigation problem" concerning the non-prosecution agreement and because Appellant had, by that time, received the death penalty with respect to the Willis murder.

¶ 44 In Appellant's resentencing trial, Appellant filed three pre-trial motions which sought to prevent Osborne and Thomason from testifying regarding Appellant's alleged participation in Janelle Fowler's death. The trial court overruled Appellant's "Motion to Prohibit State From Using Alleged Unadjudicated Crimes" and "Motion to Prohibit the Testimony of David Todd Osborne," following brief oral arguments at a motion hearing.[30] On April 9, 1996, following voir dire proceedings, the trial court addressed Appellant's "Motion to Prohibit the Use of Any Statements or Conduct of Curtis McCarty Relating to the Murder of Janelle Fowler." At that time, Appellant claimed "immunity" had been promised. In the absence of immunity, Appellant suggested a *Jackson v. Denno* hearing might be needed regarding the voluntariness of his statements to Thomason which led to the discovery of Janelle Fowler's body.[31] The State represented Thomason's testimony would be "based on his investigation of the crime, he found the body." Defense counsel asked, "For clarification, with no references to McCarty?" The trial court replied, "That's what he just said," and the hearing ended.

¶ 45 On the third day of Appellant's resentencing trial, just before Thomason was called to testify, the non-prosecution issue

*See* Supplemental Exhibit 9, Preliminary Hearing in CRF–89–5242, testimony of David Hartwicke.

28. Apparently, prosecutors were not satisfied with Appellant's sworn statement and were seeking additional information regarding his participation. See Supplemental Exhibit 9, Preliminary Hearing in Case No. CRF–89–5242, testimony of David Hartwick.

29. The argument took place during Appellant's preliminary hearing. An Oklahoma County spe-

cial judge denied the motion to dismiss, finding, "Mr. McCarty did not come clean and tell the truth...."

30. Although "immunity" was raised as an issue in both motions, the issue was never discussed by the attorneys or the trial court during the April 3, 1996 motion hearing.

31. I.e., statements made *before* Appellant's transcribed statement.

was again raised during a short hearing, outside the presence of the jury. At that time, District Attorney Macy indicated:

> [T]here is an issue raised about the—whether there was a grant of immunity. We're not even addressing that. What the evidence is going to be, is that Eddie Thomason, who is my investigator, went out with Eddie McCarty. The first day they didn't find the body. The second day Eddie Thomason went by and picked up Eddie McCarty. Eddie McCarty directed him to Draper, straight out to the body. The following day the immunity agreement was reached ... therefore the immunity agreement does not apply. It's not retroactive.

Thus, the State claimed Thomason could testify Appellant led them to Janelle Fowler's body because the State's non-prosecution agreement with Appellant was not reached until the following day. The trial court allowed Thomason to testify, ruling, "immunity is never retroactive. That would not make sense to me." The trial court also overruled defense counsel's request for a *Jackson v. Denno* hearing, finding Appellant was not in custody at the time of the statements.

¶ 46 Following these rulings, Osborne and Thomason were called as witnesses in the resentencing trial. Osborne testified Appellant had murdered Janelle Fowler. Thomason testified Appellant led him to Janelle Fowler's body.

¶ 47 The difficulties arising from the testimony of Osborne and Thomason are primarily due to factual complexities and a misunderstanding regarding the nature of the agreement to which Appellant entered with the Oklahoma County prosecutors. The parties speak in terms of "immunity" throughout the record and briefs. However, Appellant was never granted any form of immunity.[32]

¶ 48 In Oklahoma, in order for a witness to obtain immunity from prosecution for giving incriminating testimony,[33] the witness must have either testified under an agreement made with the prosecuting attorney and approved by the trial court,[34] or the witness must have claimed the privilege of silence which the trial court must have then denied and compelled the witness to testify. *See Cortez v. State*, 1966 OK CR 17, 415 P.2d 196, 199.

¶ 49 In the instant case, Appellant took the first step towards achieving immunity by entering into a non-prosecution agreement with the district attorney's office.

---

32. Two types of immunity have been recognized: "Use immunity" does not bar prosecution of the witness, but forbids the admission of any testimony that is specifically immunized and the evidence derived therefrom. It does not protect the witness from prosecution for a crime to which the witness' compelled testimony related if the evidence used against the witness was acquired independently of the compelled testimony even though the evidence was obtained from sources suggested by the immunized testimony. "Transactional immunity", on the other hand, protects the witness from prosecution for any transactions about which the witness testified under immunity. *See* L. Whinery, *Oklahoma Evidence, Commentary on the Law of Evidence* § 43.57 (1994); *Clem v. State*, 1985 OK CR 66, 701 P.2d 770, 773–774.

33. Immunity in Oklahoma is governed by Article II, Section 27 of the Oklahoma Constitution, which provides:

> Any person having any knowledge or possession of facts that tend to establish the guilt of any other person or corporation under the laws of the state shall not be excused from giving testimony or producing evidence, when legally called upon so to do, on the ground that it may tend to incriminate him under the laws

of the state; but no person shall be prosecuted or subjected to any penalty of forfeiture for or on account of any transaction, matter, or thing concerning which he may so testify or produce evidence. All other provisions of this state in conflict with the provisions of this constitutional amendment are hereby expressly repealed. This provision, as a grant of transactional immunity, provides complete immunity from prosecution for any crime to which the witness' testimony related. L. Whinery, *Oklahoma Evidence, Commentary on the Law of Evidence* § 43.57 (1994), relying on *Clem*, 701 P.2d at 773–774; *Morrison v. State*, 49 Okl.Cr. 369, 294 P. 825 (1931); and *Ex Parte Gudenoge*, 2 Okl.Cr. 110, 100 P. 39 (1909); *see also Harris v. State*, 1992 OK CR 74, 841 P.2d 597, 600–601.

34. In *Harris*, 841 P.2d at 601, we noted, in order to obtain immunity, "the State shall present to the [district court] a written agreement setting forth the conditions upon which the grant of immunity will be based." The judge then conducts a hearing before a court reporter, reviews the agreement, makes inquiries to the parties regarding their understanding of the agreement, and, if all is acceptable, approves the request by written order. At that point, immunity attaches.

However, the agreement was never approved by the district court. In *Barnett v. State*, 23 Okl.Cr. 363, 214 P. 948 (1923), we rejected the defendant's immunity defense where the alleged non-prosecution agreement had not been approved by the district court. In *Hughes v. James*, 86 Okl.Cr. 231, 190 P.2d 824, 828 (1948), we stated, "If the County Attorney seeks to make an agreement with the defendant to dismiss a prosecution under the statute, the agreement should be submitted to the court for his approval." Our reasoning was predicated on 22 O.S.1941, §§ 815[35] & 816.[36] Additionally, in *Scribner v. State*, 9 Okl.Cr. 465, 132 P. 933, 945 (1913), we stated, "There is no logical escape from the conclusion that under our constitutional provisions and our statutes immunity can only be secured by the action of a court having jurisdiction to finally try the matters with reference to which the immunity is claimed."

¶ 50 In the absence of immunity, what is the legal effect of the non-prosecution agreement reached between Appellant and the prosecutors? It is obviously unenforceable as any form of immunity. However, if prosecutors attempt to introduce the statement in a future "prosecution" covered by the agreement,[37] the trial court would need to resolve the issue of whether or not the statement could be considered voluntary.[38] In *Shotwell Manufacturing Co. v. United States*, 371 U.S. 341, 347, 83 S.Ct. 448, 453, 9 L.Ed.2d 357 (1963), the Supreme Court stated:

It is of course a constitutional principle of long standing that the prosecution "must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth." *Rogers v. Richmond*, 365 U.S. 534, 541, 81 S.Ct. 735, 739, 5 L.Ed.2d 760. We have no hesitation in saying that this principle also reaches evidence of guilt induced from a person under a governmental promise of immunity, and where that is the case such evidence must be excluded under the Self–Incrimination Clause of the Fifth Amendment.

¶ 51 Here however, the record reflects Appellant's transcribed statement was not used against him in the prosecution of the Willis murder. The prosecutors used testimony separate and apart from Appellant's statement, i.e. testimony from Thomason and Osborne, to support the continuing threat aggravator. That being so, we find no error

35. The court may either of its own motion or upon the application of the district attorney, and the furtherance of justice, order an action or indictment to be dismissed; but in that case the reasons of the dismissal must be set forth in the order, which must be entered upon the minutes. 22 O.S.1941, § 815.

36. The entry of a nolle prosequi is abolished, and the district attorney cannot discontinue or abandon a prosecution for a public offense, except as provided in the last section. 22 O.S.1941, § 816.

37. A review of the terms of the non-prosecution agreement between Appellant and the Oklahoma County District Attorney's office reveals the government did *not* promise to forego prosecution of Appellant for the Fowler murder. Rather, in exchange for Appellant's testimony, "the State is not pursuing the prosecution against him for having lied to investigators and having assisted in disposing of the little girl's body." Therefore, the non-prosecution agreement only addresses a prosecution for the crimes of perjury or accessory after the fact.

38. Where an agreement to turn state's evidence "has been made without the consent of the court, and defendant has acted in perfect good faith, it should be recognized by the court. But if such agreement is made by the prosecuting officer not only without, but against, the consent and over the objection of the court, it is of no validity and should not be enforced." *Scribner*, 132 P. at 944 (citations omitted). Here, there is an issue as to how truthful Appellant was during his sworn statement regarding his participation in the events leading up to the child's murder. Indeed, two judges have already declared he was untruthful. In *Scribner*, 132 P. at 941, we discussed the importance of truthfulness: "Now, if this Court establishes the doctrine that a witness cannot gain immunity unless he testifies to the truth, and nothing but the truth, and makes a complete disclosure of all material facts within his knowledge touching the matter under inquiry, and that if such witness willfully testifies falsely as to any material matter, or if such witness willfully conceals any material fact within his knowledge, then he will not secure immunity but will be subject to trial and conviction, and that his own testimony may be used against him, this will constitute the strongest safeguard which we can throw around such testimony." *Id.* at 941. *Scribner* also provided, "We find it insignificant that Appellant was not apprised of his duty to testify truthfully, as Appellant was represented by counsel at the time. Moreover, ignorance of the law is no excuse." *Id.* at 939.

in relation to the issues of immunity or the non-prosecution agreement.

¶ 52 Next, we turn to the issue of whether a *Jackson v. Denno* hearing was required with respect to the voluntariness of Appellant's statements to Thomason which led to the discovery of Janelle Fowler's body.[39] The trial court in Appellant's resentencing proceeding refused to conduct a *Jackson v. Denno* hearing, finding Appellant was not "in custody" at the time the statements were made.[40] However, although many of the *Jackson v. Denno* cases involve what amounts to a "custodial" confession, we find no binding, authoritative support for the position that a person is required to be in custody before the voluntariness of his or her confessions or statements can be challenged. The focus of a *Jackson v. Denno* hearing is coercion, not custody.

¶ 53 The State contends a *Jackson v. Denno* hearing was not required because Thomason's testimony did not reveal any "confession" by Appellant. However, we believe the teachings of *Jackson v. Denno* apply both to confessions and to incriminating statements.[41] The incriminating fact that Appellant "told" prosecutors where Janelle Fowler's body was located and helped them find it, while not amounting to a confession, necessitates an inquiry into the possibility of coercion.

¶ 54 When the issue of voluntariness was raised, the Court should have conducted a *Jackson v. Denno* hearing. Nevertheless, we find, on the record before us, that the trial court did not commit reversible error when it denied Appellant's suggestion that a *Jackson v. Denno* hearing might be necessary. This issue has been thoroughly explored in Appellant's original trial of September, 1989 and in his resentencing trial.

The issues have been addressed by motion, oral argument, trial testimony, and appellate briefs. Moreover, transcripts of similar proceedings taken in case number CRF–89–5242[42] were accepted into the record in the appeal of Appellant's retrial. The record does not support Appellant's claim of coercion. No specific instance of coercion has ever been alleged. Moreover, Appellant was represented and advised by his own personal counsel at all relevant times, and he willingly agreed to speak to the prosecutors regarding the Fowler matter. Therefore, although in the course of the trial a *Jackson v. Denno* hearing should have been held, the record reflects that such a hearing would have revealed that Appellant's statements were voluntary, free of coercion, and given during a time he was represented by counsel.

¶ 55 Next, Appellant claims the testimony from Osborne was accomplice testimony which was not sufficiently corroborated. Appellant is correct when he argues Osborne should be treated as an accomplice with respect to a prosecution for the Fowler murder. In Oklahoma, the test for determining if a person is an accomplice is whether he or she could have been charged with the crime for which the accused is on trial. *Bannister v. State*, 1996 OK CR 60, 930 P.2d 1176, 1179. Osborne was both indicted and convicted of murdering Janelle Fowler. He is therefore an accomplice as a matter of law to that crime.

¶ 56 "A conviction cannot be had upon the testimony of an accomplice unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances

---

39. Here, we are addressing statements taken before Appellant's transcribed statements of November 18, 1983.

40. Appellant never demanded a *Jackson v. Denno* hearing. His counsel stated, "there may be a *Jackson v. Denno* type of hearing required in this." Later, Appellant's counsel indicated they needed to determine, "what promises, if any, ... McCarty had when he made this prior statement."

41. *See Toles v. State*, 1997 OK CR 45, 947 P.2d 180, 186, cert. denied, —— U.S. ——, 118 S.Ct.

2380, 141 L.Ed.2d 746 (1998) (confessions); *see also Humphreys v. State*, 1997 OK CR 59, 947 P.2d 565, 573 (inculpatory statements may require *Jackson v. Denno* hearing where proper objection is made).

42. CRF–89–5242 is the proceeding in which Appellant was charged with the felony-murder of Janelle Fowler. As stated earlier, this case was dismissed after the State filed a voluntary motion to dismiss.

thereof." 22 O.S.1991, § 742. Here however, the State is not seeking to convict Appellant for the murder of Janelle Fowler. He is being sentenced with respect to his previous conviction for the murder of Pam Willis, and the jury was only considering the Fowler incident in an effort to decide the appropriate punishment for the Willis homicide.

¶ 57 On its face, 22 O.S.1991, § 742 applies to convictions and not specifically to proceedings to determine punishment. The statute does not require corroboration of second stage accomplice testimony used to support a statutory aggravator in a capital murder resentencing, and we have found no other Oklahoma statutory or constitutional provision which does so require. Indeed, at common law, the testimony of an accomplice was sufficient to warrant a conviction even though it is not corroborated, so long as the testimony satisfies the jury beyond a reasonable doubt of the guilt of the accused. *See* 23 C.J.S. *Criminal Law* § 1011. If the legislature is inclined to require independent corroboration of such second stage testimony, we will adhere to its decision. Until that time, however, we find no legal basis to require David Osborne's testimony to be corroborated.[43] The issue is really one of credibility or impeachment of Osborne's testimony.

¶ 58 Besides, David Osborne's testimony was corroborated by the testimony of Thomason. Appellant's knowledge of the exact location where Janelle Fowler's body could be found is a material fact which tends to connect Appellant to the crime. Osborne, who has unquestionably lied about this matter at some time, was subjected to cross-examination by Appellant's trial counsel, and it was the jury's job to determine whether his testimony could be believed.

¶ 59 Appellant also argues the trial court should have instructed the jury, *sua sponte*, that Osborne should be treated as an accomplice as a matter of law. Since we have rejected the notion that Osborne's testimony required independent corroboration, no such instruction was necessary. Moreover, Appellant waived the issue by never requesting

such an instruction, and therefore our review is for plain error only. *Peninger v. State*, 1986 OK CR 113, 721 P.2d 1338, 1341. We find plain error did not occur.

¶ 60 In addition to the testimony from Thomason and Osborne, the continuing threat aggravator was supported by the circumstances of Ms. Willis' murder, the testimony of P.N. (the second degree rape victim), and the testimony of Theodore Edgin. With respect to Edgin's testimony, we find the trial court did not err in allowing his testimony to be presented to the jury. Edgin testified he overheard McCarty and other men discussing the details of a murder while they were all incarcerated in the Oklahoma County jail. Edgin testified McCarty said he and a buddy had sex with a girl while they were "high on something." They killed the girl by stabbing her. Edgin said the girl was a policeman's daughter and he intended to "take care" of the father for pursuing the matter. Appellant raised no contemporaneous objection to this testimony, thereby waiving all but plain error. While Appellant claims on appeal Edgin's testimony was inadmissible because it was not sufficiently corroborated, the issue of corroboration was never expressly raised at the trial court level.

¶ 61 We recognize, however, Edgin's testimony was worth little weight. Edgin had previous felony convictions which involved dishonesty. Moreover, Edgin admitted Appellant may have only been speaking of the details of the crime for which he had been accused. Furthermore, as we noted in our previous opinion, "[a]lthough Edgin testified he had not made any agreements with the District Attorney's office in exchange for his testimony, pending felony charges against him in Oklahoma County were dismissed." *McCarty*, 904 P.2d at 118. Resolving conflicting testimony is not the task of an appellate court. That job is properly vested with the trial jury which is the exclusive judge of the weight of the evidence and the credibility of the witnesses. *Robinson*, 900 P.2d at 395. In this case, impeachment evidence was presented to the jury, the court properly in-

---

**43.** In *Duckett v. State*, 1995 OK CR 61, 919 P.2d 7, 26, this issue of second stage corroboration was raised by the Defendant and, in dicta, apparently accepted by this Court. However, our

opinion never really analyzed the issue but instead rejected the Defendant's claim of error by finding sufficient corroboration.

structed the jury on its responsibility to determine the credibility of witnesses, and the trier of fact made the decisions of weight and credibility of testimony under the law.

¶ 62 With respect to the testimony of P.N., the rape victim, we find her testimony to be admissible with respect to the continuing threat aggravator. As Appellant admits, this Court has found unadjudicated acts to be a relevant consideration with regard to the appropriateness of the death penalty. *See Charm v. State,* 1996 OK CR 40, 924 P.2d 754, 762–763, *cert. denied* 520 U.S. 1200, 117 S.Ct. 1560, 137 L.Ed.2d 707 (1997). Appellant, however, tries to draw a distinction with regard to P.N.'s testimony because Appellant was convicted of second degree rape, not forcible rape. Thus, Appellant claims it is inappropriate to allow the rape victim to take the stand and "embellish" a crime which has already been adjudicated.

¶ 63 We do not agree. "Proof of the 'continuing threat' aggravator is much more than prior convictions; it is the circumstances surrounding the murder for which the defendant has just been convicted and his prior criminal conduct." *Hain v. State,* 1996 OK CR 26, 919 P.2d 1130, 1141, cert. denied, 519 U.S. 1031, 117 S.Ct. 588, 136 L.Ed.2d 517 (1996). Appellant essentially argues the continuing threat aggravator is limited to the matters alleged in the Information or shown on the face of the judgment relating to such prior conviction. This position ignores the fact that many cases are resolved through the plea bargaining process. We see no reason to require a crime victim to limit or conform his or her testimony to the matters pled in the State's charging document or set forth in the judgment. P.N. was called to testify concerning the events which led to Appellant's second degree rape conviction. She testified under oath and was subject to cross-examination. If Appellant wished to further challenge her testimony, he could have introduced rebuttal witnesses. The mere fact that details of P.N.'s testimony reflected what amounts to a greater offense than that to which Appellant pled guilty does not render it inadmissible.

¶ 64 Appellant also claims P.N.'s testimony was inadmissible because "only facts and circumstances existing either prior to or during the crime itself were relevant to Mr.

McCarty's future dangerousness." We have previously rejected this argument. *See Charm,* 924 P.2d at 762–763.

¶ 65 Appellant further claims P.N.'s testimony required independent corroboration because it was so "inherently improbable or unworthy of credence," citing *Commander v. State,* 1987 OK CR 43, 734 P.2d 313, 315, in support. However, we find Appellant has done little more than make a bare allegation on this point. Most certainly, Appellant has not shown the trial court abused its discretion in allowing P.N. to testify.

¶ 66 Appellant's fourth, fifth, and seventh propositions of error, insofar as they relate to evidentiary issues, are therefore denied. We now turn to Appellant's claim that the evidence supporting the continuing threat aggravator was insufficient.

¶ 67 When the sufficiency of the evidence of an aggravating circumstance is challenged on appeal, the proper test is whether there was any competent evidence to support the State's charge that the aggravating circumstance existed. *Hain,* 919 P.2d at 1146. In making this determination, this Court should view the evidence in the light most favorable to the State. *Id.*

¶ 68 Appellant's likely involvement in the kidnapping which preceded Janelle Fowler's death, the testimony of P.N., and the callousness of Ms. Willis' murder are sufficient evidence to support the jury's finding that Appellant would commit criminal acts of violence which would constitute a continuing threat to society. *Id.* at 1146–1147.

¶ 69 In his sixth proposition of error, Appellant challenges the sufficiency of the evidence with respect to the "especially heinous, atrocious, or cruel" aggravating circumstance. He claims there was no evidence Pamela Willis was conscious for a significant length of time and therefore her death was not preceded by torture or serious physical abuse. He also claims the evidence was insufficient because the State never proved he, rather than John Doe, stabbed, smothered, or sexually assaulted the victim.

¶ 70 The standard for determining the existence of the "especially heinous, atrocious, or cruel" aggravator was stated in

*Cheney v. State*, 1995 OK CR 72, 909 P.2d 74, 80:

> [T]his Court has limited this aggravating circumstance to cases in which the State proves beyond a reasonable doubt that the murder of the victim was preceded by torture or serious physical abuse, which may include the infliction of either great physical anguish or extreme mental cruelty. "Absent evidence of conscious physical suffering of the victim prior to death, the required torture or serious physical abuse standard is not met." As to the extreme mental cruelty prong of this aggravating circumstance, "torture creating extreme mental distress must be the result of intentional acts by the defendant. The torture must produce mental anguish in addition to that which of necessity accompanies the underlying killing. Analysis must focus on the acts of the defendant toward the victim and the level of tension created." (citations omitted)

Using this standard, the evidence is more than sufficient to support the jury's finding that Pamela Willis' murder was especially heinous, atrocious, or cruel.

¶ 71 The evidence at trial reflects a forced entry was made through the home where Pamela Willis was staying. The attack likely began in the bedroom, because a bent knife was found in one of the beds. The bend in the knife was consistent with a stab wound found on the victim which likely struck bone. Additionally, a pair of jeans, turned inside out, and some panties were found lying next to the bed. Pamela Willis was found naked, lying on the kitchen floor. She had been strangled and stabbed three times.[44] She had a rope around her neck and various bruises and contusions on her face, neck and back. The presence of petechiae on Ms. Willis' eyes and larynx indicates the victim had been suffocated.

¶ 72 The testimony also revealed Ms. Willis was alive when two of the stab wounds took place. It is unclear whether the victim was conscious when she was stabbed. The evidence could not conclusively establish whether the stabbing or suffocation occurred first, or were simultaneous. If the fatal stab wound took place first, Ms. Willis could have bled while conscious for several minutes to an hour. If suffocation took place first, Ms. Willis may have been conscious for less than a minute. Nevertheless, death was not instantaneous.

¶ 73 There was also evidence of extreme mental cruelty. Dale Coffman testified he called the house several times on the night of the attack. During one of the calls, the phone was answered, and Mr. Coffman heard a voice which sounded like Ms. Willis yell, "Help" or "Help me, Dale."

¶ 74 A struggle to gasp for the next fleeting breath of needed oxygen, while at the same time being mentally and emotionally traumatized by a conscious realization that life is being drained from the body by that deprivation of air supports the jury's finding that the murder was especially heinous, atrocious, or cruel. Taken together with her pleas for help and the very real inference to be drawn from the evidence that Ms. Willis was conscious during or immediately after one or more of the stabs, we find the evidence sufficient to support this aggravator.

¶ 75 Concerning Appellant's argument that he was never proven to be the perpetrator of the stabbing and suffocating, we refer back to Propositions One and Nine. This argument is not germane to the issues before this Court on review of the appeal on resentencing or based on the facts of this case. Appellant relies on *Barnett v. State*, 1993 OK CR 26, 853 P.2d 226 and *Hawkins v. State*, 1994 OK CR 83, 891 P.2d 586, *cert. denied*, 516 U.S. 977, 116 S.Ct. 480, 133 L.Ed.2d 408 (1995), but those cases involved situations where the evidence clearly reflected that another person committed the acts of serious physical abuse preceding the victim's death. Here, we are dealing with, in Appellant's own words, a "phantom co-defendant," and Appellant has been convicted on two separate occasions as the perpetrator of the crime. It is true that, during the guilt stage, the State alleged and even argued the possible involvement of another perpetrator. However, Appellant is the only person who has been convicted of malice aforethought murder; no other person has been identified. This fact

---

44. One stab was most likely post-mortem.

clearly distinguishes the holdings in *Barnett* and *Hawkins*. Proposition six is denied.

¶ 76 In his eighth proposition of error, Appellant challenges the voir dire proceedings, claiming the trial court failed to remove one juror who would automatically vote for the death penalty and erroneously removing two others who expressed general reservations about voting for the death sentence. We find no error here.

¶ 77 *Morgan v. Illinois*, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), requires the trial court to excuse for cause a venireman who will automatically vote for the death penalty in every case. Such a person must be dismissed for cause because that person will not follow the jury instructions which channel the proper use of evidence in mitigation and aggravation. *Knighton v. State*, 1996 OK CR 2, 912 P.2d 878, 885. The standard for striking a prospective juror for cause based on his or her views on capital punishment is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instruction and his oath". *Id.*, (*quoting Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985)). In adopting this standard, we have said a prospective juror is only required to be willing to consider all the penalties provided by law and should not be irrevocably committed before the trial begins. *Hain*, 919 P.2d at 1138.

■■■ ¶ 78 Prospective juror Moser testified he was "more partial to the death penalty." However, he repeatedly stated he would consider all three punishment options, i.e. life, life without parole, or death. He also indicated he would not automatically vote for the death penalty. Thus, there was no abuse of discretion in failing to disqualify him once he was challenged for cause.

¶ 79 Prospective jurors Fisher and Allen were both excused from the jury panel because they said they could not consider imposing the death penalty under any circumstances. Their responses indicated they were irrevocably committed to vote against the death penalty regardless of the law and their views about capital punishment would have prevented or substantially impaired their performances as jurors in accordance with the instructions and their oath. *See Romano v. State*, 1993 OK CR 8, 847 P.2d 368, 377, *aff'd.*, 512 U.S. 1, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994). Proposition eight is therefore denied.

¶ 80 In his tenth proposition of error, Appellant claims the trial court improperly limited his closing arguments "in such a way that prevented him from impeaching the state's case and drawing reasonable inferences from the evidence in violation of the sixth and fourteenth amendments...." Appellant alleges the trial court took a "friend of the state" approach to the trial.

■■■ ¶ 81 During closing arguments, defense counsel attempted to present arguments regarding the State's failure to present, during the resentencing stage, any serological evidence linking Appellant to the semen found on Ms. Willis. Defense counsel argued, "Now why is a jailhouse snitch standing as a substitute for where forensic evidence should be?" The State objected, arguing such evidence "went to the first stage and you limited us as to what we could present." The trial court pointed out that a serologist testified in the first stage[45] and therefore refused to let Appellant argue that no serological evidence had been presented. The trial court also found the evidence had been "limineed out because of the motion you filed...."

¶ 82 We find no error in this ruling. As previously discussed, defense counsel filed a motion in limine which sought to exclude first stage evidence having to do with guilt, innocence, or identity. Whatever the effect of that motion was, it did not have the effect of requiring the State to retry the first stage. If Appellant had so desired, he could have asked to have the first stage serology testimony, which never conclusively linked Appellant to any crime, readmitted in the second stage.[46] Then, Appellant could have argued

---

**45.** Joyce Gilchrist appeared on behalf of the State in the first stage trial. We found her testimony to be only slightly relevant and insufficient by itself to connect Appellant with the commission of the crime. *McCarty*, 904 P.2d at 116–117.

**46.** 21 O.S.Supp.1993, § 701.10a(4).

the serological evidence proved nothing. However, it would be inappropriate to argue no serological evidence was introduced at the trial. Moreover, Appellant was able to argue that, "You didn't hear any evidence from Dr. Jordan telling you whose semen that was. You are not to presume whose semen that was, period."

¶ 83 The remainder of proposition ten deals with the allegation that the trial court severely restricted defense counsel in the use of his words during closing arguments, but gave the State wide latitude to repeatedly use objectionable phrases. The argument is essentially that the trial court was extremely partial to the State in the use of its "considerable discretion."

¶ 84 We cannot find any error here due to the fact that the defense never objected to the State's repeated use of the "objectionable phrases". Moreover, we find no error in the trial court's decision to restrict defense counsel from calling David Osborne a "liar". *See Holliday v. State,* 1988 OK CR 105, 755 P.2d 124, 126–127 ("It was only the prosecutor's choice of the word 'liar' that was unfortunate"). Proposition ten is denied.

¶ 85 In his eleventh proposition of error, Appellant claims the testimony of Dr. Fred Jordan, chief medical examiner for Oklahoma County, was based upon hearsay with no applicable exception. He claims the person who actually performed the autopsy, Dr. James Dibdin, was not shown to be unavailable and therefore Appellant had the right to cross-examine him. Appellant claims his right of confrontation was denied. He also claims Dr. Jordan lacked personal knowledge regarding the autopsy report.

¶ 86 The trial court found that the autopsy report was subject to the business records exception to the hearsay rule. 12 O.S.1991, § 2803(6). While the trial court appears to

have reached the right result with this ruling,[47] we should note that the autopsy report was never offered as an exhibit in the trial.[48] Dr. Jordan did frequently refer to the report, however, during his testimony. The trial court found this was permissible because Dr. Jordan is the Chief Medical Examiner and custodian of all records of his office.[49] The trial court further reasoned that Dr. Jordan, as an expert, "can testify regarding findings made by another expert, as to medical records of another expert." The statutory basis for this last statement appears to be 12 O.S. 1991, §§ 2703 & 2705, although no specific citation was articulated.

¶ 87 Defense counsel responded with an offer of proof, citing the Oklahoma Supreme Court's opinion in *Horn v. Sturm,* 1965 OK 52, 408 P.2d 541, for the proposition that autopsy reports are prepared for trial and therefore outside the hearsay exception. Defense counsel also cited *Bennett v. State,* 1968 OK CR 219, 448 P.2d 253, for the proposition that documents which have, along with other information, opinions and conclusions do not fall within the business record exception. Neither case satisfactorily resolves the precise issue before us. *Horn* and *Bennett* were both decided many years before Oklahoma's evidence code was enacted. Moreover, both cases are distinguishable because *Horn* dealt with hospital authorities requesting an autopsy "with litigation in mind" while *Bennett* dealt with a psychiatrist's written opinion. Neither case reviewed Oklahoma's statutes concerning the office of the Medical Examiner.[50] Further, as stated above, the autopsy was never admitted into evidence.

¶ 88 The question presented is whether the Chief Medical Examiner may testify regarding an autopsy which he him-

---

47. In *Manocchio v. Moran,* 919 F.2d 770 (1st Cir.1990), the Court found "[w]hile an autopsy report, strictly speaking, does not fall within the category of a clearly recognized hearsay exception, it shares most of the features of both the business records and the public records exceptions." *Id.* at 774 (citation omitted). "[W]e hold that the autopsy report presented in this case possessed sufficient 'particularized guarantees of trustworthiness' that its admission in the absence of live testimony by its preparer did not offend the Confrontation Clause." *Id.* at 777.

48. Exhibits 57–60 were diagrams made by Dr. Dibdin on standard forms which were included within the autopsy report.

49. Jordan was acting Chief Medical Examiner when Pam Willis was murdered.

50. 63 O.S.1981, § 931 et seq.

self did not perform. We think he can. Pursuant to 63 O.S.1991, § 935, the Chief Medical Examiner is "directly responsible to the Board for the performance of the duties provided for in this act. . . ." An autopsy "shall be performed by the Chief Medical Examiner or such person as may be designated by him. . . ." *See* 63 O.S.1991, § 945. The Chief Medical Examiner is statutorily required to investigate all violent human deaths. *See* 63 O.S.1991, §§ 938, 943 & 944. The Chief Medical Examiner is required to keep the records of autopsies performed by his office as part of his permanent records. 63 O.S.1991, § 949. Certified copies of autopsy reports, exclusive of hearsay evidence, are admissible in a criminal court by stipulation of the parties. *Id.* Additionally, the Chief Medical Examiner or those working on his behalf may be required to appear in court and testify. *Id.*

¶ 89 An autopsy report constitutes "facts or data . . . of a type reasonably relied upon" by the Chief Medical Examiner as an expert in forming opinions or inferences upon a subject. See 12 O.S.1991, § 2703. Here, the Chief Medical Examiner was qualified to testify as to the matters shown in the autopsy. Any questions regarding his testimony go to the weight and credibility, not admissibility. Dr. Dibdin, the actual preparer of the report, "was not necessarily any better suited than another equally trained medical examiner familiar with the procedures and medical implications to answer the questions as to the medical opinions presented in the report." *Manocchio v. Moran,* 919 F.2d 770, 781 (1st Cir.1990). This proposition is denied.

¶ 90 In his twelfth, fifteenth, sixteenth, seventeenth, and eighteenth propositions of error, Appellant raises issues which have previously been reviewed and rejected by this Court. In proposition twelve, Appellant claims the trial court improperly refused to give a jury instruction on Appellant's ineligibility for parole if sentenced to life imprison-

ment without the possibility of parole. However, "there is no requirement for a trial judge to explain the Oklahoma parole process to a jury." *Mayes v. State,* 1994 OK CR 44, 887 P.2d 1288, 1318, *cert. denied,* 513 U.S. 1194, 115 S.Ct. 1260, 131 L.Ed.2d 140 (1995). Appellant has not convinced us to rule otherwise.

¶ 91 In proposition fifteen, Appellant claims the "wide scope of unadjudicated crimes and bad acts allowed in Oklahoma capital murder trials" violated his due process rights. However, this Court has found unadjudicated acts to be a relevant consideration with regard to the appropriateness of the death penalty. *See Charm,* 924 P.2d 754, 762–763. We have already reviewed the specific unadjudicated acts which Appellant is attacking. We will not revisit the broader issue here.

¶ 92 In proposition sixteen, Appellant claims error in failing to give a requested instruction which defined the term "society" as prison society with respect to the continuing threat aggravator. Again, this issue has been repeatedly answered and rejected by this Court. *Berget v. State,* 1991 OK CR 121, 824 P.2d 364, 374, *cert. denied,* 506 U.S. 841, 113 S.Ct. 124, 121 L.Ed.2d 79 (1992). The term "society" refers to society as a whole. *Braun v. State,* 1995 OK CR 42, 909 P.2d 783, 797–798. The fact that the jury sent a note regarding the meaning of the term "threat to society" does not mean we should change our interpretation of this phrase.

¶ 93 In proposition seventeen, Appellant claims certain jury instruction errors denied Appellant his due process rights under the eighth and fourteenth amendments.[51] However, as the State's appellate brief accurately reflects and Appellant's brief admits, this Court has previously rejected each of the claimed errors raised by Appellant with respect to the jury instructions.

---

**51.** Appellant claims: the jury instructions allowed the jurors to impose the death penalty if they determined the evidence in aggravation outweighed the mitigating evidence, i.e. a preponderance of the evidence standard; the instructions did not require the jury to consider mitigating circumstances, but instead left the matter to the jury's discretion; the jury instructions regarding mitigation were "sandwiched" among instructions relating to aggravating circumstances which made reference to the need for unanimity, thereby implying that the mitigators had to be found unanimously; and the jury instructions failed to inform the jury that, even if the aggravating circumstances outweighed the mitigating circumstances, the jury could still choose to give a life sentence.

¶ 94 In proposition eighteen, Appellant claims the continuing threat aggravator and especially heinous, atrocious, or cruel aggravator are unconstitutionally vague. None of Appellant's arguments convince us that our current jurisprudence on this issue is now incorrect. Propositions twelve, fifteen, sixteen, seventeen, and eighteen are denied.

¶ 95 In his thirteenth proposition of error, Appellant claims his right to a fundamentally fair and reliable sentencing proceeding were violated by prosecutorial misconduct. He first claims the State misled the court concerning evidentiary rulings. However, the examples Appellant uses to illustrate his point have already been reviewed in this opinion, and no error was found. Secondly, Appellant claims the prosecutors "failed to correct false and misleading testimony." Here, Appellant points to inconsistent statements from the State and its witness regarding whether P.N.'s family had been involved in the plea negotiations on Appellant's second degree rape conviction. District Attorney Macy indicated to the trial court the family had not participated, but Ted Ritter testified before the jury that they had. We find no reversible error here. The District Attorney's comments were made outside the presence of the jury, and Appellant has not demonstrated Mr. Ritter's testimony was false.

¶ 96 The remainder of this proposition deals with supposedly improper arguments made by the prosecutors during closing. The vast majority of these comments were not met at trial with contemporaneous objections, thereby waiving all but plain error. *Freeman v. State*, 1994 OK CR 37, 876 P.2d 283, 287. "Many of the comments at issue fall within the wide range of permissible arguments. None were so egregious as to have risen to the level of reversible error." *McCarty*, 904 P.2d at 123. Proposition thirteen is denied.

¶ 97 In his fourteenth proposition of error, Appellant claims he was denied the effective assistance of trial counsel. He alleges seven instances. We find two worthy of discussion.[52] First, Appellant alleges his trial counsel should have submitted jury instructions regarding Appellant's "individual culpability" for the acts of serious physical abuse to Pamela Willis and regarding David Osborne's status as an accomplice to the Fowler murder. Second, Appellant claims trial counsel should have informed the jury about Appellant's non-prosecution agreement and promised immunity with respect to the Fowler murder.

¶ 98 While it may be true that there is no tactical reason to omit an instruction concerning Appellant's personal culpability, the simple fact is that there was really no evidence presented to this jury which would necessitate such an instruction.[53] Moreover, an accomplice instruction was not required, and even if it were, any error would be harmless due to sufficient corroboration.

¶ 99 With respect to the trial counsel's failure to inform the jury about the existence of a non-prosecution agreement, there are obvious strategic reasons why trial counsel would not want to explore this area. The agreement itself is contained in the body of Appellant's transcribed statement which contains unsettling and damning information regarding Appellant's participation in the Fowler murder. Appellant's honesty in relation to the statement is rather suspect to say the least, and an attempt to introduce the agreement could have easily backfired. It appears from the record before us trial counsel deliberately chose to avoid this area and instead focus on mitigation. This was reasonable trial strategy.

¶ 100 Appellant has failed to show that his representation fell below that expected of a reasonable, competent, and skillful defense

---

52. The remaining five are as follows: trial counsel failed to object to improper vouching of David Osborne's testimony; trial counsel failed to move for a continuance when Dr. Draper was not ready to appear on Appellant's behalf; trial counsel failed to object to the rebuttal testimony provided by Ted Ritter; trial counsel failed to object to many instances of prosecutorial misconduct; and trial counsel failed to argue the inferences from the evidence concerning the "prior violent felony" aggravating circumstance. Each of these have already been addressed and rejected in this opinion, had no supporting citations, or fall within the umbrella of trial strategy.

53. See prior discussion concerning propositions one, six, and nine.

attorney. *See Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Lockhart v. Fretwell,* 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). He has not shown a deficient performance which renders the result of the trial unreliable or the proceeding fundamentally unfair. *See Walker v. State,* 1997 OK CR 3, 933 P.2d 327, 342–343, (concurring opinion). Proposition fourteen is denied. Likewise, Appellant's Application for Evidentiary hearing on Sixth Amendment Claims of ineffective assistance of counsel, filed August 15, 1997 is also denied.

¶ 101 In his nineteenth proposition of error, Appellant claims his due process rights were violated by the "aggregate impact of the errors in his case". This proposition is without merit.

¶ 102 Finally, in his twentieth proposition of error, Appellant claims his due process rights were deprived by a hostile judge who was "prejudiced against Mr. McCarty and his lawyers." Appellant sets forth numerous instances occurring throughout the trial to support his claim of error.

¶ 103 It is difficult to analyze this proposition of error from a cold record. We recognize this was an extremely difficult case with emotions running high on both sides. A young girl was brutally murdered. She was a policeman's daughter. Her family misses her terribly. A young man with a troubled past has been convicted of her murder. He made numerous incriminating statements, but the physical evidence is rather slight. *See McCarty,* 904 P.2d at 116–120. The prosecutors demand justice. The defense seeks mercy.

¶ 104 The trial judge is in the middle of this emotionally charged scene. He is expected to make instantaneous rulings of constitutional importance, often armed with little more than his own legal experience, his sense of fairness, and trial counsels' representations regarding the current status of the law. In the heat of the moment, a trial can be quite frustrating. At the same time, we recognize a judge has many clearly defined adjudicative responsibilities. 5 O.S.1981, Ch. 1, App.4, Canon 3(A)(1–4).

▮▮▮▮ ¶ 105 That being so, Appellant points to instances in the record where the trial judge made derogatory comments regarding the Oklahoma Indigent Defense System and the Oklahoma Court of Criminal Appeals. He also points to numerous other incidents which he alleges show an open hostility to the defense.

¶ 106 It is not our job to lecture trial judges regarding the Code of Judicial Conduct. We are concerned with errors which may have affected Appellant's right to a fair trial. 20 O.S.1991, § 40. It is regrettable when a trial judge's human imperfections in the course of a trial might raise the specter of a lack of impartiality, but here we must ascertain whether the court's actions were prejudicial to a constitutional degree. We cannot say they were. The vast majority of the instances outlined by Appellant occurred outside the presence of the jury. Thus, Appellant suffered no prejudice as a result thereof. Appellant's twentieth proposition is denied.

### MANDATORY SENTENCE REVIEW

¶ 107 Pursuant to 21 O.S.1991, § 701.13(C), we must determine (1) whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor, and (2) whether the evidence supports the jury's finding of the aggravating circumstances as enumerated in 21 O.S.1981, § 701.12.[54] Turning to the second portion of this mandate, the jury found the existence of three aggravating circumstances: (1) the defendant was previously convicted of a felony involving the use or threat of violence to the person; (2) the murders were especially heinous, atrocious or cruel; and (3) the existence of a probability the defendant would commit criminal acts of violence that would constitute a continuing threat to society. 21 O.S.1991, § 701.12(1), (4), & (7). As discussed previously, we have found all three of the aggravators supported by sufficient

---

**54.** As part of our review, we have also considered our opinion in *McCarty v. State,* 904 P.2d 110 (Okl.Cr.1995).

evidence. The testimony from P.N. demonstrates Appellant's prior felony conviction involved violence or the threat thereof. The testimony from P.N., David Osborne, and Eddie Thomason, along with the circumstances of Ms. Willis' murder demonstrates Appellant poses a continuing threat to society. Furthermore, the evidence demonstrates Ms. Willis' death by stabbing and suffocation was especially heinous, atrocious, or cruel.

¶ 108 Mitigating evidence was presented by Appellant in the form of eight witnesses who collectively testified to the following: Appellant has parents and a family who love him and are supportive of him, and whom he loves in return; as a young man, Appellant was a positive and loving influence on both his immediate and extended family; Appellant has the potential for rehabilitation and for contributing to the lives of his family; as a teenager, Appellant became involved in alcohol and drug abuse, which had an adverse effect on his behavior, thought processes, relationships, and the way he responded to the world; Appellant has successfully freed himself from drug and alcohol dependence; in December, 1982, Appellant had a severe drug problem which caused serious emotional and mental disturbance; prior to his drug problems, Appellant was an outgoing, bright young man, who consistently achieved good grades in school and participated in school sporting activities; while imprisoned, Appellant has made constant strides toward self-improvement and self education; Appellant is now a thoughtful and intelligent adult with a wide range of constructive interests; during his incarceration, Appellant has been a cooperative, well-behaved prisoner; Appellant has a young son whom he loves; Appellant has shown generosity and compassion toward his fellow inmates; Appellant has not been a violent or disruptive influence while in prison; and that due to his drug problems, Appellant never completed his formal education, dropping out of school in the tenth grade.

¶ 109 Upon our review of the record and careful weighing of the aggravating circumstances and the mitigating evidence, we find the sentence of death to be factually substantiated and appropriate. We cannot say the sentence of death is being imposed under the influence of passion, prejudice, or any other arbitrary factor.

### DECISION

¶ 110 The sentence of death is hereby **AFFIRMED.**

JOHNSON, J., concurs.

CHAPEL, P.J., STRUBHAR, V.P.J., and LANE, J., concur in result.

### ORDER DENYING PETITION FOR REHEARING

¶ 1 Appellant, through counsel, filed a Petition for Rehearing and Motion to Stay Mandate in the above-styled appeal on November 30, 1998. Therein, Appellant requested a rehearing of his appeal and reconsideration of this Court's November 6, 1998 Opinion with respect to Proposition II of his appellate brief.

¶ 2 In our Opinion, after exhaustively considering Appellant's propositions of error and the entire record before us on appeal, we affirmed Appellant's death sentence. In so doing, we addressed Appellant's challenges to the "prior violent felony" aggravator, including the argument that his second degree rape conviction was not a "previous" conviction because the rape occurred three years after Pamela Willis' murder. In resolving that question, we stated that "we have previously rejected this argument, and Appellant has not convinced us to hold otherwise", citing *Grasso v. State*, 1993 OK CR 33, ¶ 24, n. 4, 857 P.2d 802, 809, n. 4 in support. Consistent with *Grasso*, we emphasized that the statutory focus is not when the crime was committed but if a "conviction occurred prior to the sentencing hearing in the present case." We also found Appellant was not prejudiced by the jury instruction which told the jury to determine "whether at the time this crime was committed ... defendant was previously convicted of a felony involving the use or threat of violence to the person."

¶ 3 Appellant now claims that our reliance on *Grasso* is misplaced because the portion of the *Grasso* opinion upon which we are relying is "classic dicta". Appellant also argues that our decision is in conflict with Oklahoma's Uniform Jury Instructions, spe-

cifically OUJI–CR 435 (1st ed.) and OUJI–CR4–72 (2nd ed.), its most recent amended version. In OUJI–CR 435 (1st ed.),the jury is instructed to "determine whether at the time this crime was committed . . . [t]he Defendant(s)(was) (were) previously convicted of a felony involving the use or threat of violence to the person". In OUJI–CR4–72 (2nd ed.), the jury is instructed to determine if the "defendant, prior to the murder, was convicted of a felony involving the use or threat of violence to the person."

¶ 4 A petition for rehearing is governed by Rule 3.14, Rules of the Court of Criminal Appeals, Title 22, Ch.18, App. (1998). According thereto, a Petition for Rehearing shall not be filed as a matter of course, but only for two specific reasons. Appellant's petition for rehearing claims that"questions decisive of the case and duly submitted by the attorney of record were overlooked by the Court" and that "issues duly presented to the Court were disposed of in ways that are contrary to controlling authority."

■ ¶ 5 This Court did not overlook the argument raised in Appellant's brief and the issues presented were not decided in ways that are contrary to controlling authority. We have now addressed this issue on three occasions. In addition to our opinions in *McCarty v. State*, 1998 OK CR 61, 977 P.2d 1116, and *Grasso*, we recently held similarly in *Miller v. State*, 1998 OK CR 59, ¶ 55, 977 P.2d 1099. Other Courts have addressed this issue and reached alike result. *See Knight v. State*, 721 So.2d 287, 297 (Fla. 1998); *Smith v. State*, 729 So.2d 1191 (Miss. 1998). Considering all of these cases together, along with the statutory language of 21 O.S.1991, §§ 701.10 and 701.12(1),this Court has determined that the focus of the prior violent felony aggravator is whether the defendant was convicted of a felony involving the use or threat of violence prior to his or her sentencing proceeding, not prior to the commission of the crime at issue.

■ ¶ 6 However, Appellant's Petition for Rehearing raises valid points concerning the language in our jury instructions. Therefore, in light of our decisions in *McCarty*, *Grasso*, and *Miller*, the language of paragraph one of OUJI–CR 4–72 (2nd ed.) is hereby modified to read:

1. The defendant, prior to the time of sentencing, was convicted of a felony involving the use or threat of violence to the person;

We believe this modification will more accurately state the statutory language from which the referenced jury instruction was derived. Further, in making this modification, we find no basis for striking the prior violent felony aggravator in this appeal as a violation of *ex post facto* principles.

¶ 7 Accordingly, the Petition for Rehearing and Motion to Stay Mandate are hereby DENIED.

IT IS SO ORDERED.

/s/ Reta M. Strubhar
RETA M. STRUBHAR, Presiding Judge

/s/ Gary L. Lumpkin
GARY L. LUMPKIN, Vice Presiding Judge

/s/ Charles A. Johnson
CHARLES A. JOHNSON, Judge

/s/ Charles S. Chapel
CHARLES S. CHAPEL, Judge

/s/ Steve Lile
STEVE LILE, Judge

LUMPKIN, Vice–Presiding Judge:
Specially Concurring.

¶ 1 I would like to commend Matthew D. Haire, Appellant's appellate counsel, for his excellent legal work in Mr. McCarty's resentencing appeal and petition for rehearing. Instead of presenting the standard arguments we see in most appeals, counsel has professionally presented us with thought-provoking issues, a well-reasoned analysis, and insightful arguments which have challenged us, both legally and intellectually. This is the quality of appellate advocacy which advances, clarifies, and helps to improve our understanding of the law.

¶ 2 Counsel's comments regarding my prior writings regarding dicta and the need for an accurate and consistent application of precedent are well-taken. Our jury instructions needed to be modified, and counsel's efforts clarified this issue for the Court. Furthermore, counsel correctly notes that statements in footnotes are generally regarded as dicta and that I have previously written to that issue, urging the Court to confine its decisions to the body of the opinion. *See e.g.*

*Cannon v. State,* 1995 OK CR 45, ¶¶ 1–8, 904 P.2d 89, 108. However, other members of the Court have not adopted that position.

¶ 3 While I did not author the *Grasso* opinion, I did vote to concur in the Court's decision. Upon re-examining the issue presented in *Grasso,* it is clear that the Court did not base its affirmance of the prior violent felony aggravator entirely on language found in footnote four. However, it is also clear that footnote four was not entirely inconsequential to the decision. While I would certainly have preferred a more detailed analysis in the body of the *Grasso* opinion, I found, and continue to find, the legal position for which it stood to be correct.